**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 08-61018-CIV-UNGARO

D.W. HUGO, Derivatively on behalf of
Nominal Defendant BANKATLANTIC
BANCORP, INC.,

      Plaintiff,

v.

ALAN B. LEVAN, JARETT S. LEVAN,
JAY C. MCCLUNG, MARCIA K. SNYDER,
VALERIE TOALSON, JAMES A. WHITE,
JOHN E. ABDO, D. KEITH COBB, STEVEN
M. COLDREN and DAVID A. LIEBERMAN,

      Defendants,

and

BANKATLANTIC BANCORP, INC.,

      Nominal Defendant.

_____/

**JOINT MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

     Plaintiff D.W. Hugo, Nominal Defendant BankAtlantic Bancorp, Inc., and  Defendants

Alan B. Levan, Jarett S. Levan, Jay C. McClung, Marcia K. Snyder, Valerie Toalson, James A.

White, John E. Abdo, D. Keith Cobb, Steven M. Coldren and David A. Lieberman (collectively,

the "Parties") move jointly, pursuant to Federal Rule of Civil Procedure 23.1, for preliminary

approval of the proposed settlement of this action, which is codified in the Stipulation of

Settlement dated August 24, 2009 (attached hereto as Exhibit A).  For the reasons set forth

below, the Parties respectfully ask the Court to enter an Order that, *inter alia*: (1) preliminarily

approves the Settlement as fair, reasonable and adequate; (2) directs the issuance of notice as contemplated in the Stipulation; and (3) schedules a hearing to consider final approval of the Settlement.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

This shareholder derivative action, which was commenced on July 2, 2008, is one of four related actions against BankAtlantic Bancorp and certain of its officers and directors.   The first filed action was a securities fraud class action: *Hubbard v. BankAtlantic Bancorp, Inc., et al.*, Case No. 07-61542-CIV-UNGARO (the "Securities Action").   The next filed action was an ERISA class action: *Almonor v. BankAtlantic Bancorp, Inc., et al.*, Case No. 07-61862-CIV-UNGARO (the "ERISA Action").   Then, after the filing of this lawsuit, another shareholder derivative lawsuit was commenced in the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida: *Feldman v. Alan B. Levan, et al.*, Case No. 0846795 07 (the "Feldman Action").

All of the cases arise out of the same core allegations regarding BankAtlantic Bancorp's commercial real estate loan portfolio and the corresponding public disclosures and filings.  Here, the principal allegation is that the various individual Defendants "breached their fiduciary duties by causing the Company to engage in illicit business practices with respect to the their Commercial Real Estate Loan Portfolio in contravention of the Company's lending policies, as well as the standards set forth by lending agencies, and by disseminating false and misleading SEC filings that failed to disclose and properly account for the Company's loan losses." Complaint ¶ 2.   The Complaint also relies heavily on allegations of misconduct regarding BankAtlantic Bancorp's loan to Steeplechase Properties, LLC. Complaint ¶ 3.

Defendants denied all of these allegations from the outset.  Indeed, according to Defendants, the bulk of the allegations in these cases are simply made up out of whole cloth, originally created by assumptions of what might have happened (but, in fact, did not happen). Defendants further claim that the unverified statements of so called confidential witnesses in the Securities Action are patently untrue.  Defendants assert that every financial institution making loans in Florida of any kind during the last few years has suffered huge loan losses as a consequence of the meltdown of the economy, and that BankAtlantic, the FDIC insured subsidiary of BankAtlantic Bancorp has remained "well capitalized" throughout these catastrophic events because it had more stringent loan underwriting standards than most of its competitors in Florida.  Moreover, Defendants assert that BankAtlantic Bancorp, long before the catastrophic economic conditions occurred, gave clear unambiguous warnings in its public filings about the state of the market in Florida and how adverse events could impact its earnings.

As to the Steeplechase loan in particular, Defendants have consistently maintained that the losses associated with this loan were the consequence of fraudulent acts by a borrower and his counsel, both of whom have been convicted of bank fraud, and that these same persons defrauded other institutions as well with similar wrongful acts. Defendants maintain that, notwithstanding the most stringent underwriting standards, all of which appeared to have been met when the credit was extended, fraud happens.  Defendants point out that this loan was isolated and fully and accurately reported, and has no relevance to the credit losses suffered as a consequence of the economic collapse — the Steeplechase losses were aggravated by the collapse.  Defendants have also consistently maintained that there are no allegations, let alone established facts, to connect the Steeplechase loan to any purported pattern of misconduct with

respect to the loan portfolio in general.  Indeed, according to Defendants, BankAtlantic Bancorp specifically avoided the kinds of high risk sub-prime and "pay us if you want" loans that have plagued other institutions, and applied loan underwriting standards in strict accordance with the established policies and procedures, which will allow the institution to survive and prosper when other, less carefully managed institutions will fail.

Plaintiff's allegations in this case were based on an investigation of the information publicly available at the time suit was filed.  During discovery, Plaintiff conducted a sufficient and meaningful investigation with respect to the asserted claims.  Plaintiff deposed BankAtlantic Bancorp's President, Jarett Levan.[1]  Plaintiff deposed BankAtlantic Bancorp's Chief Financial Officers, Valerie Toalson.[2]  Plaintiff deposed BankAtlantic Bancorp's former Chief Financial Officer, James White.[3]  And, Plaintiff deposed BankAtlantic Bancorp's former Vice President of Commercial Real Estate for the relevant time period, Marcia Snyder.[4]  Defendants deposed \Plaintiff,\ D.W. Hugo.[5]  Plaintiff also reviewed the BankAtlantic Bancorp's numerous relevant public filings, as well as the applicable law for the asserted claims.

The deposition testimony provided a cogent explanation and refuted the claims brought in this case.  For example, one of the allegations in the Complaint is that BankAtlantic Bancorp contravened its own lending policies.  *See* Complaint ¶ 2.  James White, the former Chief

---

[1] A true and correct copy of the Jarett Levan deposition transcript is attached as Exhibit B.

[2] A true and correct copy of the Valerie Toalson deposition transcript is attached as Exhibit C.

[3] A true and correct copy of the James White deposition transcript is attached as Exhibit D.

[4] A true and correct copy of the Marcia Snyder deposition transcript is attached as Exhibit E.

[5] A true and correct copy of the D.W. Hugo deposition transcript is attached as Exhibit F.

Financial Officer, testified expressly to the contrary. *See* White Depo. at 34-36.  Jarett Levan

similarly testified at length regarding the relevant lending practices and policies::

> We have always viewed ourselves as a generally conservative underwriter. We
> make loans in every category where we believe we use utmost prudence. We look
> at all the criteria. And if we're not comfortable with a particular loan or particular
> borrower, we'll turn the loan down. Our loan to values are we believe fairly
> conservative. We have an appraisal process and an appraisal review process.
> Generally we think in our underwriting we are considered more conservative than
> the rest of the market.

Levan Depo. at 73-74.   Regarding further allegations that BankAtlantic Bancorp failed to

account for its loan losses properly, Valerie Toalson testified at length as to how the relevant

accounting rules do not allow a company to manage its earnings by taking loan loss reserves

prior to when the loans actually become troubled loans.  *See* Toalson Depo. at 110-111.  Toalson

similarly testified that, as Chief Financial Officer, she could confirm the accuracy of the publicly

disclosed financial information, as well as the accuracy of the reporting with respect to the

commercial real estate loan portfolio and loan loss reserves in particular.  *See* Toalson Depo. at

111.

With respect to Steeplechase, Marcia Snyder testified that, notwithstanding the fact that

the loan was handled in an appropriate manner, the bank was defrauded. According to Ms.

Snyder, BankAtlantic correctly relied on the accuracy of the outside appraisal it received on the

property (as it did in compliance with its underwriting standards), and further relied on the

representations made by the borrower and his counsel that were investigated and appeared

reliable.  Ms. Snyder, who is no longer an employed by BankAtlantic, also testified that the

Steeplechase loan became a non-performing loan through no fault of BankAtlantic Bancorp, but

because of the deterioration of the market in general.

All of the witnesses testified that to the extent the commercial real estate loan portfolio suffered losses, those losses were the direct result of the credit and real estate market crises in Florida.  *See* Toalson Depo. at 90-91; Levan Depo. at 79-85; Snyder Depo. at 107.  And, according to all of the witnesses, BankAtlantic Bancorp made express disclosures regarding precisely that issue.

In light of the deposition testimony, Plaintiff recognizes that the interests of BankAtlantic Bancorp are not served by continuing to pursue these claims. The testimony confirms the absence of fact necessary to support a claim against Defendants. The management choices at issue are protected by Florida's business judgment rule, which is an absolute bar to any sort of recovery.  *See In re The Bal Harbour Club, Inc.*, 316 F.3d 1192, 1195 (11th Cir. 2003) ("courts presume that directors have acted in good faith") (citation omitted); *see also* FLA. STAT. § 607.0831 (a director will generally not be "personally liable for monetary damages to the corporation or any other person for any statement, vote, decision, or failure to act, regarding corporate management or policy").

After the close of discovery, on July 1, 2009, the parties participated in a lengthy mediation with Mark A. Buckstein as mediator.  At the conclusion of the mediation, the parties reached a settlement, subject to approval by this Court and the required notice to BankAtlantic Bancorp's shareholders.  On July 8, 2009, pursuant to S.D. Fla. Local Rule 16.2.F and this Court's Order of Referral to Mediation, the Parties notified this Court of the settlement and informed that the Parties would be filing the required settlement documents required by Rule 23.1.  On July 9, 2009, the Court issued an Order Upon Notice of Settlement requiring that the Parties file the settlement agreement, a motion for approval of the settlement agreement, a

proposed form of notice, and a motion for approval of the form of notice. The Court's Order also required the Parties to address a number of substantive legal issues with respect to the settlement and the notice. Those matters are addressed below.

## II.     MEMORANDUM OF LAW

### A.     The Standards Governing Preliminary Approval

Federal Rule of Civil Procedure 23.1(c) governs the settlement of derivative actions. The Rule provides that derivative actions "may be settled . . . only with the court's approval." Fed. R. Civ. P. 23.1(c). It further provides that "[n]otice of a proposed settlement . . . must be given to shareholders or members in the manner that the court directs." *Id.*[6]

This motion seeks preliminary approval, which is the first of a two-step process — final approval being the second step. The standards for preliminary approval are "not as stringent as those" for final approval. *In re OCA, Inc. Sec. and Derivative Litig.*, No. 05-2165, 2008 WL 4681369, at *11 (E.D. La. Oct. 17, 2008) (citations omitted); *see also* MANUAL FOR COMPLEX LITIGATION § 21.63 ("At the stage of preliminary approval, the questions are simpler, and the court is not expected to, and probably should not, engage in analysis as rigorous as is appropriate for final approval."). Indeed, the purpose of preliminary approval is not to make a substantive determination on the merits of the settlement, but rather to communicate the proposal to the class, and to authorize the manner and form of the notice for doing so.

In order to grant preliminary approval, a court "need only conclude that the settlement of

---

[6] The Rule 23.1(c) requirements are substantially similar to, though less detailed than, the Rule 23(e) requirements for settling a case with a Rule 23 certified class. For purposes of preliminary approval, however, the applicable standards are the same. *See In re United Health Group Inc. Shareholder Derivative Litig.*, No. 06cv1216, 2009 WL 1929308, at *2 (D. Minn. Jul. 6, 2009) (citations omitted).

the claims on the agreed upon terms is within the range of possible approval." *In re NVIDIA Corp. Deriv. Litig.*, No. 06-06110, 2008 WL 5382544, at \*2 (citations and internal quotations omitted). A proposed settlement is within the range of possible approval if it is "fair, reasonable and adequate." *Id.* (citations omitted). To make that determination, courts have considered the following factors: (1) the absence of any collusion among the parties; (2) the significant risks of continued litigation; (3) the complexity, expense and duration of the litigation; (4) the relief provided under the proposed settlement; (5) the advanced stage of the litigation; and (6) the judgment of experienced counsel for the parties. *See Fresco v. Auto Data Direct, Inc.*, No. 03cv61063, 2007 WL 2330895, at \*5 (S.D. Fla. May 14, 2007). *See also In re OCA Inc.*, 2008 WL 4681369, at \*11 (citations omitted) ("If the proposed settlement discloses no reason to doubt its fairness, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, does not grant excessive compensation to attorneys, and appears to fall within the range of possible approval, the court should grant preliminary approval."); *see also Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1299 (S.D. Fla. 2007) ("By granting preliminary approval, the undersigned merely confirmed the proposed settlement fell within the range of possible approval, and communicated that proposal to the class.").

Furthermore, there is a strong public policy favoring compromises that resolve litigation. *See In re NVIDIA Corp.*, 2008 WL 5382544, at \*2 ("There is an overriding public interest in settling and quieting litigation.") (citations omitted). This is especially true with respect to "class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re GMC Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d

768, 784 (3d Cir. 1995). Settlements are particularly favored in shareholder derivative actions, which are "notoriously difficult and unpredictable," *In re AOL Time Warner Shareholder Deriv. Litig.*, No. 02cv6302, 2006 WL 2572114, at *3 (S.D.N.Y. Sep. 6, 2008) (citations omitted).

### B.    The Court Should Preliminarily Approve the Settlement

Applying the foregoing criteria, there can be no question that the proposed settlement in this case is fair, reasonable and adequate.

#### 1.    There is no collusion among the parties.

The process that led to the settlement was undeniably fair. This case has been pending for over a year. During that time, Plaintiff conducted pre- and post-filing investigations of the derivative claims and the events and transactions underlying those claims, including, but not limited to, inspection, review and analysis of BankAtlantic Bancorp's relevant public filings. The parties also filed extensive legal memoranda with respect to Defendants' motion to dismiss the Complaint. After Defendants filed an Answer, Plaintiff deposed BankAtlantic Bancorp's President, its current and former Chief Financial Officers, and its former Vice President of Commercial Real Estate for the relevant time period. Defendants deposed the Plaintiff, D.W. Hugo. Since the close of discovery, the parties had been preparing motions for summary judgment and for trial.[7]

---

[7] The fact that Plaintiff did not obtain document discovery is of little moment with respect to the settlement. Courts have repeatedly rejected the notion that the "too little discovery" objection is a valid basis upon which to reject a settlement. *See, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977) (affirming approval of settlement and noting that "[i]t is true that very little formal discovery was conducted and there was no voluminous record in the case. However, the lack of such does not compel the conclusion that insufficient discovery was conducted."); *Francisco v. Numismatic Guaranty Corp.*, No. 06cv61677, 2008 WL 649124, at *11 (S.D. Fla. Jan. 31, 2008) (approving settlement and overruling objection for lack of discovery); *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1316-17 (S.D. Fla. 2005) (approving settlement

The settlement itself is the result of good faith arm's-length bargaining. The parties reached this settlement only after extensive negotiations with the assistance of an experienced mediator. The settlement also does not provide for any sort of monetary consideration or for the payment of attorneys' fees, further establishing the appropriate nature of the relationship. *See In re Zoran Corp. Derivative Litig.*, No. 06cv05503, 2008 WL 941897, at *2 (N.D. Cal. Apr. 7, 2008) (noting that collusive settlements typically entail handsome attorneys' fees to plaintiff's counsel as *quid pro quo* for broad releases and disposal of troublesome claims). All of these facts confirm the absence of collusion.

### 2.    There are significant risks with continued litigation.

The risks associated with continuing the litigation are significant. Derivative actions are notoriously complex and expensive to prosecute. *See, e.g., In re AOL Time* Warner, 2006 WL 2572114, at *3 (approving a derivative settlement and noting that "shareholder derivative actions are notoriously difficult and unpredictable") (citations omitted); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (affirming the approval of a derivative action settlement and noting that the "odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful"). Indeed, had Plaintiff continued to litigate this case, he would have faced a host of potential risks and costs, including the potential for successful attacks against the pleadings, the high costs associated with lengthy and complex litigation, potential

---

and overruling objection as to lack of discovery). Indeed, it should be clear that an argument that document discovery might have found something is contrary to the letter and spirit of the Federal Rules. Plaintiffs must start with something to warrant discovery. *See Cotton*, 559 F.2d at 1332 ("We have often seen cases which were 'over discovered.' In addition to wasting the time of the Court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may serve as a vehicle to harass a party.").

loss at the summary judgment stage, and the inherent risks of trial should the case progress that far.  Even a favorable judgment at trial would undoubtedly result in numerous post-trial motions. And, even if liability were established, the amount of recoverable damages would be uncertain. There is a genuine risk of no recovery at all, even after years of litigation.

The settlement eliminates these and other risks of continued litigation.  Similarly, by reaching a settlement, Defendants avoid the significant risks and costs of litigation, including the costs associated with continued litigation, potential liability and exposure to damages. More importantly, the settlement allows Defendants to end the distraction that arises as a result of litigation and the corresponding drain on resources, and focus more on running their business. The settlement also allows the Nominal Defendant to focus its efforts on defending against the Securities and ERISA actions.  All of these concerns militate in favor of preliminary approval of the settlement.

3.    This case is complex, expensive and lengthy.

Along these same lines, the complexity, expense and duration of the litigation also favor preliminary approval of the settlement. Continuing this litigation would require the resolution of numerous complex issues of law, at the cost of considerable time and expense to the parties and the Court.  For example, given the number of individual Defendants, the summary judgment motions alone would impose a tremendous expense and time burden. And those burdens would only increase with a trial. *See AOL Time Warner, Inc.*, 2006 WL 2572114, at *5 ("this litigation boasts numerous defendants, multiple claims, and complex factual issues; the prosecution of this Action would require the Company to incur substantial costs. Termination of the litigation at this stage of the proceedings obviates the expenditure of any future time and expense in connection

with this action," and will allow the Company to direct its full attention to its substantive business).

                4.      <u>The settlement terms are appropriate.</u>

The settlement in this case provides for an exchange of mutual releases and a dismissal with prejudice of all claims against all Defendants. There is no additional consideration, monetary or otherwise, for the settlement. This Court's July 8, 2009 Order Upon Notice of Settlement asks whether such a settlement is reasonable. *See* DE 61. As explained below, for this particular case, the settlement is eminently reasonable and appropriate.

To begin with, the settlement confers significant benefits on Plaintiff and Defendants, as well upon BankAtlantic Bancorp and its shareholders. Indeed, non-monetary settlement benefits may support approval of a settlement. *See Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) ("non- pecuniary benefits to the corporation may support a settlement"). As indicated above, the settlement eliminates the numerous risks, costs and burdens of litigation for everyone. Defendants, to be sure, enjoy the significant benefits that flow from resolving the claim, and thus eliminating the remote possibility of an adverse judgment. Defendants also enjoy the costs and time savings benefits from ending the litigation now, as well as the security of a release for any and all claims that could have been brought in this case.

The benefit to Plaintiff is equally tangible. Plaintiff enjoys the same cost and time saving benefits as Defendants, as the settlement will obviate the need for further litigation expense. Plaintiff also gets a release for any claims that could have brought with respect to the prosecution of the claim, including a potential statutory claim for attorneys' fees and costs incurred by Defendants in defending against the claims.

More importantly, Plaintiff, in his derivative capacity representing the interests of Nominal Defendant BankAtlantic Bancorp and its other shareholders, secures the benefit of freeing company resources that otherwise would have been spent on this case. In that regard, BankAtlantic will now be able to focus its efforts on what is really important — managing its substantive business in this most challenging economic environment. Moreover, BankAtlantic Bancorp will be able to re-allocate its litigation resources toward defending against the Securities and ERISA actions, both of which are based on patently false allegations of wrongdoing, yet whose defense will require a substantial investment of both time and money.

These benefits flowing from the settlement are of particular value when compared to the strength of the claims in this case.  Indeed, "[i]n evaluating the fairness, reasonableness and adequacy of a settlement, the court is primarily concerned with the strength of the case for plaintiffs on the merits balanced against the amount offered in settlement." *In re AOL Time Warner, Inc.*, 2006 WL 2572114, at *3 (citation omitted).  Two of the factors that courts typically address in determining whether a derivative action settlement warrants final approval — as opposed to the less demanding standard for preliminary approval sought here — are "(1) the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial; [and] (2) the likelihood of success in light of the risks posed by continued litigation." *Id.* These factors compel both preliminary and final approval of the settlement.

As set forth in section I, *supra*, the Defendants' testimony provided a cogent explanation that refuted the claims in this case.  Accordingly, the likelihood of Plaintiff's success at trial and on appeal was minimal.  The likelihood of success when measured against the risks posed by continued litigation are stark. The likelihood of success is minimal at best, while the

-13-

corresponding risks are significant.   Viewed in this light, the settlement terms are not only

appropriate, but also exactly what is required in a case of this sort.

      The relevant case law supports this conclusion.  *In re Fleet/Norstar Securities Litig.*, 935

F. Supp. 99 (D.R.I. 1996), which involved that Court's dual analysis of separate settlements of a

securities class action and a shareholder derivative action, is particularly instructive.  The nature

of the claims is strikingly familiar:

> The plaintiffs' claims were based on Defendants' alleged gross mismanagement
> of Fleet's loan portfolios . . . The origin of both actions is the serious deterioration
> of real estate values in the New England area that occurred in the second half of
> 1989 and continued into 1990. One of the consequences was an increase in the
> number and amount of delinquent bank loans to developers and purchasers of real
> estate.

935 F. Supp. at 103.  The substance of the plaintiffs' core assertion is similarly comparable:

> Fleet's management misrepresented to the investing public that the Company was
> a highly successful banking operation which had deftly managed to avoid the
> abyss of the deteriorating New England real estate market into which other banks
> had fallen.

*Id.*  And, the Court's concluding remarks about the case also prove to be equally applicable to

this case:

> The Court is well aware that this litigation was protracted and complex. Yet, it is
> worth remembering that the true genesis of this litigation was an unfortunate
> downturn of the real estate economy in New England. Perhaps the injuries alleged
> by the stockholders in this case are attributable only to the economic downturn.

*Id.* at 117.

      Against this backdrop, the parties to the derivative action entered into a "clear sailing

agreement." *Id.* at 104. That is, in exchange for an award of attorney's fees and reimbursement of

expenses in total amount not exceeding $499,000, which Defendant agreed to pay, the plaintiffs

agreed to end the case. *Id.*   In evaluating and approving the settlement, the Court first determined that the "settlement is voluntary," with "no evidence of coercion or outright collusion." *Id.* at 111.   The Court then determined that such a clear sailing agreement, even with a payment of attorneys' fees to plaintiffs' counsel, "does not offend state or federal statutes, nor the Constitution." *Id.*

With respect to the substantive terms of the settlement, specifically the lack of monetary or non-monetary consideration, the Court, in approving the settlement but refusing to award attorneys' fees, noted that "the most important factor is the strength of the case for the plaintiffs on the merits, balanced against the amount offered in settlement." *Id.* at 111 (citations omitted). In that regard, the Court noted that "[t]he merits of the derivative action were tenuous at best." *Id.*  The Court further observed:

> While a brief evaluation of the claims leads the Court to seriously doubt the value of the plaintiffs' derivative action, approval of the settlement is warranted. The proposed settlement offered by Fleet obviously does not provide for a payment of damages to itself. It includes only the option of payment of Plaintiff's attorneys' fees. This is the only possible financial recovery available to Plaintiff. For reasons discussed below, the Court declines to award attorney fees to derivative Plaintiff counsel. Therefore, Fleet is not required to pay anything to Plaintiffs. A settlement which includes only the possibility of the payment of attorney fees is fair, adequate and reasonable in light of the weak claims presented by Plaintiff.

*Id.* at 112.   Later, the Court notes that the business judgment rule would likely bar recovery in any event. *Id.* at 114-15.

This *Fleet/Norstar* logic and analysis applies with equal weight to this case. Applying that analysis in this case should yield a similar result — approval of the settlement. *See also, e.g., Granada Investments, Inc., DWG Corp.*, 962 F.2d 1203, 1206 (6th Cir. 1992) ("Admittedly, the fairness of a settlement is more difficult to determine when nonpecuniary benefits are

provided to the corporation. Nonetheless, [the corporation] was released from all liability based on claims that might have been asserted"). The settlement terms are appropriate and reasonable.

5.    The litigation is at an advanced stage.

The advanced stage of this litigation further supports preliminary approval. The case is over a year old. Discovery has concluded. Vigorous and contentious motion practice has been present from the beginning, including a motion to dismiss and numerous discovery related motions.

The settlement comes on the heels of extensive arm's length negotiations, some of which were overseen and assisted by mediator Mark Buckstein. Even after reaching an agreement in principle, the parties had continued meaningful discussions to reduce the settlement to writing. The negotiations commenced near the time when the parties would soon be filing motions for summary judgment, and then preparing for trial. Consequently, "the parties and the Court are well placed to assess the strength of this case and the comparative benefits of the proposed settlement." *Fresco*, 2007 WL 2330895, at *6.

6.    The parties' experienced counsel support the settlement.

The support for this Settlement from the parties' experienced counsel also weighs in favor of preliminary approval. Plaintiff is represented by numerous well-respected law firms with experience in class actions and shareholder derivative cases. Defendants are also represented by a leading Florida law firm with vast class action experience representing both plaintiff and defendants. "The unanimous support of counsel for this settlement weights strongly in favor of its approval." *Fresco*, 2007 WL 2330895, at *6; *In re NVIDIA Corp.*, 2008 WL 5382544, at *4 ("significant weight should be attributed to counsel's belief that settlement is in

-16-

the best interests of those affected by the settlement").

**C.     The Court Should Approve the Manner and Form of Notice**

The Stipulation of Settlement provides for notice of the proposed settlement to BankAtlantic Bancorp's shareholders. The notice itself is sufficiently clear, as it plainly and succinctly informs as to the nature of the settlement, the date of the fairness hearing, and the deadline for objecting to the settlement.

The notice will be disseminated to BankAtlantic Bancorp's shareholders through various means. The Stipulation requires Defendants' Counsel to publish the Notice in a press release for the Business Wire or similar service. It further requires Defendants' Counsel to post the Notice and the Stipulation of Settlement on BankAtlantic Bancorp's website. And, it also requires that Defendants' Counsel cause the Notice to be filed on a Form 8-K with the United States Securities and Exchange Commission. These notice efforts, taken together, are more than reasonable. Indeed, given the cost of providing individual notice to all BankAtlantic Bancorp shareholders, particularly in light of the unique non-monetary nature of this settlement, individual notice in this case is not reasonable under the circumstances. *See Fresco*, 2007 WL 2330895, at *8. Thus, in preliminarily approving this settlement, the Court should also direct notice in accordance with the terms of the Stipulation.

**III.    CONCLUSION**

For the foregoing reasons and on the foregoing authorities, the Court should grant this motion, and enter the proposed Order attached as Exhibit G.

Respectfully Submitted,


NIX, PATTERSON & ROACH, LLP
3600 B. North Capital of Texas Highway
Suite 350
Austin, TX 78746
Telephone:          (512) 328-5333
Facsimile:          (512) 328-5335


s/ Jeffrey J. Angelovich
JEFFREY J. ANGELOVICH

*Attorneys for Plaintiff*
*(additional counsel listed on service list)*


STEARNS          WEAVER          MILLER
WEISSLER
ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone:  (305) 789-3200
Facsimile:   (305) 789-3395


s/ Eugene E. Stearns
EUGENE E. STEARNS
Florida Bar No. 149335
estearns@swmwas.com
RICHARD JACKSON
Florida Bar No. 898910
rjackson@swmwas.com
ADAM M. SCHACHTER
Florida Bar No. 647101
aschachter@swmwas.com
GORDON M. MEAD, JR.
Florida Bar No. 49896
gmead@swmwas.com


*Attorneys for Defendants*

-18-

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on August 24, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF or other approved means.

<u>s/ Adam M. Schachter</u>
ADAM M. SCHACHTER

## SERVICE LIST

*D. W. Hugo v. Alan B. Levan, et al.*
CASE NO. 08-61018-CIV-UNGARO
United States District Court for the Southern District of Florida

James P. Gitkin
Eric T. Salpeter
SALPETER GITKIN, LLP
Museum Plaza - Suite 503
200 South Andrews Avenue
Fort Lauderdale, FL 33301
Tel: (954) 467-8622
Fax: (954) 467-8623
*Attorneys for Plaintiff*

Jeffrey J. Angelovich
NIX, PATTERSON & ROACH, LLP
3600 B. North Capital of Texas Highway
Suite 350
Austin, TX 78746
Tel: (512) 328-5333
Fax: (512) 328-5335
*Attorneys for Plaintiff*

Bradley E. Beckworth
Susan Whatley
Brad Seidel
NIX, PATTERSON & ROACH, LLP
205 Linda Drive, PO Box 769
Daingerfield, TX 75638
Tel: (903) 645-7333
Fax: (903) 645-5389
*Attorneys for Plaintiff*

John C. Goodson
KEIL GOODSON, P.A.
406 Walnut Street
PO Box 618
Texarkana, AR 71854
Tel: (870) 772-4113
Fax: (870) 773-2967
*Attorneys for Plaintiff*