**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 08-61018-CIV-UNGARO

D.W. HUGO, Derivatively on behalf of
Nominal Defendant BANKATLANTIC
BANCORP, INC.,

      Plaintiff,

v.

ALAN B. LEVAN, JARETT S. LEVAN,
JAY C. MCCLUNG, MARCIA K. SNYDER,
VALERIE TOALSON, JAMES A. WHITE,
JOHN E. ABDO, D. KEITH COBB, STEVEN
M. COLDREN and DAVID A. LIEBERMAN,

      Defendants,

and

BANKATLANTIC BANCORP, INC.,

      Nominal Defendant.

_____/

**JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT**

NIX, PATTERSON & ROACH, LLP
3600 B. North Capital of Texas Highway
Suite 350
Austin, Texas 78746
Telephone: (512) 328-5333
Facsimile: (512) 328-5335

*Attorneys for Plaintiff*
*(additional counsel listed on service list)*

STEARNS WEAVER MILLER WEISSLER
 ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 789-3200
Facsimile: (305) 789-3395

*Attorneys for Defendants and Nominal*
*Defendant*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION ...................................................................................................... 1

II.     FACTUAL AND PROCEDURAL BACKGROUND ................................................. 1

        A.      The Cases ........................................................................................................ 1

        B.      The Allegations and Defenses ........................................................................ 2

        C.      The Evidence .................................................................................................. 3

        D.      The Settlement ............................................................................................... 5

III.    MEMORANDUM OF LAW ..................................................................................... 6

        A.      The Standards For Judicial Approval Of Derivative Settlements .................... 6

                1.      The law favors settlement. .................................................................. 6

                2.      The Court's role in approval of a derivative settlement. ..................... 6

        B.      The Court Should Approve the Settlement ...................................................... 8

                1.      There is no collusion among the parties. .............................................. 8

                2.      There are significant risks with continued litigation, reducing the
                        likelihood of success at trial. .............................................................. 9

                3.      This case is complex, expensive and lengthy. .................................... 10

                4.      The settlement terms are appropriate. ................................................ 10

                5.      The litigation is at an advanced stage. ............................................... 14

                6.      The parties' experienced counsel support approval of the
                        settlement. ........................................................................................ 14

                7.      The reaction of BankAtlantic Bancorp's shareholders supports
                        approval. ........................................................................................... 15

        C.      The Lone Objection Should Be Overruled ..................................................... 15

IV.     CONCLUSION ....................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Arambaru v. Healthcare Fin. Servs., Inc.*,
  No. 02cv6535, 2009 WL 1086938 (E.D.N.Y. Apr. 22, 2009) ........................................... 13, 14

*Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*,
  211 F.R.D. 457 (S.D. Fla. 2002) ...................................................................................... passim

*Bailey v. AK Steel Corp.*,
  No. 06cv468, 2008 WL 495539 (S.D. Ohio Feb. 21, 2008),
  *aff'd*, 320 Fed. Appx. 364 (6th Cir. 2009) ............................................................................. 17

*Behrens v. Wometco Enters., Inc.*,
  118 F.R.D. 534 (S.D. Fla. 1988),
  *aff'd*, 899 F.2d 21 (11th Cir. 1990) ......................................................................................... 6

*Bell Atlantic Corp. v. Bolger*,
  2 F.3d 1304 (3d Cir. 1993) ............................................................................................. 10, 19

*Bennett v. Behring Corp.*,
  737 F.2d 982 (11th Cir. 1984) ............................................................................................. 6, 7

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) .................................................................................................. 13

*Chiulli v. Hardwicke Cos.*,
  No. 6929, 1985 WL 11532 (Del. Ch. Feb. 11, 1985) ............................................................ 15

*Cotton v. Hinton*,
  559 F.2d 1326 (5th Cir. 1977) ................................................................................................. 8

*Ellis v. Naval Air Rework Facility*,
  87 F.R.D. 15 (N.D. Cal. 1980),
  *aff'd*, 661 F.2d 939 (9th Cir. 1981) .......................................................................................... 6

*Fisher Bros. v. Cambridge-Lee Indus., Inc.*,
  630 F. Supp. 482 (E.D. Pa. 1985) .......................................................................................... 14

*Francisco v. Numismatic Guaranty Corp.*,
  No. 06cv61677, 2008 WL 649124 (S.D. Fla. Jan. 31, 2008) .................................................. 8

*Fresco v. Auto Data, Inc.*,
  No. 03cv61063, 2007 WL 2330895 (S.D. Fla. May 14, 2007) ............................................... 14

*Granada Investments, Inc., DWG Corp.*,
  962 F.2d 1203 (6th Cir. 1992) ............................................................................................... 13

*In re AOL Time Warner, Inc. Shareholder Deriv. Litig.*,
No. 02cv6302, 2006 WL 2572114 (S.D.N.Y. Sep. 6, 2008).......................................... 6, 9, 10, 11

*In re Apple Computer Sec. Litig.*,
No. 84cv20148, 1991 WL 238298 (N.D. Cal. Sep. 6, 1991) ................................................... 13

*In re EVCI Career Colleges Holding Corp Securities Litig.*,
No. 05cv10240, 2007 WL 2230177 (S.D.N.Y. Jul. 27, 2007) ................................................. 6

*In re Fleet/Norstar Securities Litig.*,
935 F. Supp. 99 (D.R.I. 1996) ............................................................................................... 12, 13

*In re GMC Pick-Up Truck Fuel Tank Prods. Liability Litig.*,
55 F.3d 768 (3d Cir. 1995) ....................................................................................................... 6

*In re NVIDIA Corp. Deriv. Litig.*,
No. 06cv6110, 2008 WL 5382544 (N.D. Cal. Dec. 22, 2008)............................................. 6, 14

*In re Oracle Sec. Litig.*,
829 F. Supp. 1176 (N.D. Cal. 1993) ................................................................................... 19, 20

*In re Pac. Enters. Sec. Litig.*,
47 F.3d 373 (9th Cir. 1995) ..................................................................................................... 9

*In re SmithKline Beckman Corp. Sec. Litig.*,
751 F. Supp. 525 (E.D. Pa. 1990) ............................................................................................ 15

*In re Sunbeam Sec. Litig.*,
176 F. Supp. 2d 1323 (S.D. Fla. 2001) ..................................................................................... 15

*In re Terazosin Hydrochloride Antitrust Litig.*,
No 99mdl1317, 2005 WL 2451960 (S.D. Fla. Jul. 8, 2005) ................................................ 7, 16

*In re The Bal Harbour Club, Inc.*,
316 F.3d 1192 (11th Cir. 2003) ................................................................................................ 4

*In re United Health Group Inc. Shareholder Derivative Litig.*,
No. 06cv1216, 2009 WL 1929308 (D. Minn. Jul. 6, 2009) ...................................................... 7

*In re Walt Disney Co. Derivative Litig.*,
907 A.2d 693 (Del. Ch. 2005),
*aff'd*, 906 A.2d 27 (Del. 2006) ................................................................................................ 9

*In re Zoran Corp. Derivative Litig.*,
No. 06cv05503, 2008 WL 941897 (N.D. Cal. Apr. 7, 2008) ............................................... 8, 18

*IUE-CWA v. General Motors Corp.*,
238 F.R.D. 583 (E.D. Mich. 2006) ...................................................................................... 17, 18

*Klein v. FPL Grp., Inc.*,
   No. 02cv20170, 2004 WL 302292 (S.D. Fla. Feb. 5, 2004) .................................................. 19

*Leonhardt v. Arvinmeritor, Inc.*,
   581 F. Supp. 2d 818 (E.D. Mich. 2008) .................................................................................. 17

*Lipuma v. American Express Co.*,
   406 F. Supp. 2d 1298 (S.D. Fla. 2005).................................................................................... 8

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,
   671 F. Supp. 819 (D. Mass. 1987)........................................................................................... 6

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972) .................................................................................................. 13

*Officers for Justice v. Civil Serv. Comm'n*,
   688 F.2d 615 (9th Cir. 1982) ............................................................................................ 7, 14

*Rome v. Archer*,
   197 A.2d 49 (Del. 1964)......................................................................................................... 15

*Stepak v. Addison*,
   20 F.3d 398 (11th Cir. 1994) ........................................................................................... 18, 19

*Sterling v. Stewart*,
   158 F.3d 1199 (11th Cir. 1998) ............................................................................................... 7

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) ..................................................................................................... 7

*Williams v. First Nat'l Bank*,
   216 U.S. 582 (1910) ................................................................................................................. 6

*Zimmerman v. Bell*,
   800 F.2d 386 (4th Cir. 1986) .................................................................................................. 6

**Statutes**

§ 607.0831, FLA. STAT. ................................................................................................................ 4

**Rules**

Fed. R. Civ. P. 23.1 ........................................................................................................... 1, 6, 20

**Other Authorities**

NEWBERG ON CLASS ACTIONS § 11.51 (4th ed. 2002) ..................................................................17

Plaintiff D.W. Hugo, Nominal Defendant BankAtlantic Bancorp, Inc. ("Bancorp"), and Defendants Alan B. Levan, Jarett S. Levan, Jay C. McClung, Marcia K. Snyder, Valerie Toalson, James A. White, John E. Abdo, D. Keith Cobb, Steven M. Coldren and David A. Lieberman (collectively, the "Parties") move jointly, pursuant to Federal Rule of Civil Procedure 23.1, for final approval of the proposed settlement of this action, which is codified in the Stipulation of Settlement dated August 24, 2009.[1]  The grounds supporting this motion are set forth below. A proposed order containing findings of fact and conclusions of law supporting final approval of the settlement is attached as Exhibit A.   A proposed final approval order and judgment of dismissal with prejudice is attached as Exhibit B.

## I.      INTRODUCTION

The Parties in this case negotiated a good faith, arm's length settlement following over a year of litigation, and now seek final approval of that settlement after resolution of a related securities class action in favor of Bancorp and certain of the individual Defendants.   The settlement is appropriate in light of the nature of the evidence as revealed during the course of this case and in the related securities class action, and is fair, reasonable and adequate as a matter of law and fact.  It is also in the best interests of Bancorp and its shareholders, as well as Plaintiff and the individual Defendants.  Consistent with its findings supporting preliminary approval, as well as the near total absence of objection to the settlement, this Court should now grant final approval, and bring this case to a close.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Cases

This shareholder derivative action, which was commenced on July 2, 2008, is one of four related actions against Bancorp and certain of its officers and directors.    The first filed action was a securities fraud class action: *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, Case No. 07-61542-CV-UNGARO (the "Securities Action").   The next filed action was an ERISA class action: *Almonor v. BankAtlantic Bancorp, Inc., et al.*, Case No. 07-61862-CIV-UNGARO (the "ERISA Action").   Then, after the filing of this lawsuit, another shareholder derivative lawsuit

---

[1] The Parties' August 24, 2009 Joint Motion for Preliminary Approval of Settlement (DE 71) attached Exhibits A through G.  All of those Exhibits are expressly incorporated herein and will be cited as "JMPA Ex. ___."  The Stipulation of Settlement is JMPA Ex. A. The Parties will provide the Court with an additional courtesy copy of all the Exhibits.

was commenced in the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida: *Feldman v. Alan B. Levan, et al.*, Case No. 0846795 07 (the "Feldman Action").

**B.     The Allegations and Defenses**

All of the cases arise out of the same core allegations regarding Bancorp's commercial real estate loan portfolio and the corresponding public disclosures and filings.   Here, the principal allegation is that the various individual Defendants "breached their fiduciary duties by causing the Company to engage in illicit business practices with respect to their Commercial Real Estate Loan Portfolio in contravention of the Company's lending policies, as well as the standards set forth by lending agencies, and by disseminating false and misleading SEC filings that failed to disclose and properly account for the Company's loan losses." Complaint ¶ 2.  The Complaint also relies heavily on allegations of misconduct regarding a particular loan to Steeplechase Properties, LLC.  Complaint ¶ 3.

Defendants denied all of these allegations from the outset. Indeed, according to Defendants, the bulk of the allegations in these cases are simply made up out of whole cloth, created by assumptions of what might have happened (but, in fact, did not happen).  Defendants further claim that the unverified statements of so called confidential witnesses in the Securities Action are untrue; the great bulk of those allegations were in fact disavowed by both the confidential witnesses themselves and the plaintiffs in the Securities Action.  Defendants assert that every financial institution making loans in Florida of any kind during the time frame relevant to these cases suffered significant loan losses as a consequence of the meltdown of the economy, and that BankAtlantic, which is the FDIC insured subsidiary of Bancorp, had more stringent loan underwriting standards than most of its competitors in Florida.  Defendants further assert that Bancorp, long before these economic conditions occurred, gave unambiguous warnings in its public filings about the state of the market in Florida and how adverse events could impact its earnings.

As to the Steeplechase loan in particular, Defendants have consistently maintained that the losses associated with this loan were the consequence of fraudulent acts by a borrower and his counsel, both of whom have been convicted of bank fraud, and that these same persons defrauded other institutions as well with similar wrongful acts.  Defendants maintain that, notwithstanding the most stringent underwriting standards (all of which appeared to have been

met when the credit was extended), fraud happens.  Defendants further maintain that this loan was isolated and fully and accurately reported, and has no relevance to the credit losses suffered as a consequence of the economic collapse — the Steeplechase losses were aggravated by the collapse.  Defendants have also consistently maintained that there are no allegations, let alone established facts, to connect the Steeplechase loan to any purported pattern of misconduct with respect to the loan portfolio in general.  Indeed, according to Defendants, Bancorp specifically avoided the kinds of high risk sub-prime and "pay us if you want" loans that have plagued other institutions, and applied loan underwriting standards in strict accordance with the established policies and procedures.

### C.      The Evidence

Plaintiff's allegations in this case were based on an investigation of the information publicly available at the time suit was filed.  During discovery, Plaintiff conducted a sufficient and meaningful investigation with respect to the asserted claims.  Plaintiff deposed Bancorp's President, Jarett Levan. *See* JMPA Ex. B.  Plaintiff deposed Bancorp's Chief Financial Officers, Valerie Toalson. *See* JMPA Ex. C.  Plaintiff deposed Bancorp's former Chief Financial Officer, James White. *See* JMPA Ex. D.  And, Plaintiff deposed Bancorp's former Executive Vice President of Commercial Real Estate for the relevant time period, Marcia Snyder. *See* JMPA Ex. E.  Defendants deposed Plaintiff D.W. Hugo.  *See* JMPA Ex. F.  Plaintiff also reviewed BankAtlantic Bancorp's numerous relevant public filings, as well as the applicable law for the asserted claims.

The deposition testimony provided a cogent explanation and refuted the claims brought in this case.  For example, one of the allegations in the Complaint is that BankAtlantic Bancorp contravened its own lending policies. *See* Complaint ¶ 2.  James White, the former Chief Financial Officer, testified expressly to the contrary. *See* White Depo. at 34-36.  Jarett Levan similarly testified at length regarding the relevant lending practices and policies:

> We have always viewed ourselves as a generally conservative underwriter. We make loans in every category where we believe we use utmost prudence. We look at all the criteria. And if we're not comfortable with a particular loan or particular borrower, we'll turn the loan down. Our loan to values are we believe fairly conservative. We have an appraisal process and an appraisal review process. Generally we think in our underwriting we are considered more conservative than the rest of the market.

Levan Depo. at 73-74.   Regarding further allegations that BankAtlantic Bancorp failed to account for its loan losses properly, Valerie Toalson testified how the relevant accounting rules do not allow a company to manage its earnings by taking loan loss reserves prior to when the loans actually become troubled loans.  *See* Toalson Depo. at 110-111.  Toalson similarly testified that, as Chief Financial Officer, she could confirm the accuracy of the publicly disclosed financial information, as well as the accuracy of the reporting with respect to the commercial real estate loan portfolio and loan loss reserves in particular.  *See* Toalson Depo. at 111.

With respect to Steeplechase, Marcia Snyder testified that, notwithstanding the fact that the loan was handled in an appropriate manner, the bank was defrauded.  According to Ms. Snyder, BankAtlantic correctly relied on the accuracy of the outside appraisal it received on the property (as it did in compliance with its underwriting standards), and further relied on the representations made by the borrower and his counsel that were investigated and appeared reliable.  Ms. Snyder also testified that the Steeplechase loan became a non-performing loan through no fault of BankAtlantic Bancorp, but because of the deterioration of the market in general.

All of the witnesses testified that to the extent the commercial real estate loan portfolio suffered losses, those losses were the direct result of the credit and real estate market crises in Florida.  *See* Toalson Depo. at 90-91; Levan Depo. at 79-85; Snyder Depo. at 107.   And, according to all of the witnesses, BankAtlantic Bancorp made express disclosures regarding precisely that issue. This deposition testimony indicated the absence of fact necessary to support a claim against Defendants.  Also, the management choices at issue are protected by Florida's business judgment rule, which is an absolute bar to any sort of recovery.  *See In re The Bal Harbour Club, Inc.*, 316 F.3d 1192, 1195 (11th Cir. 2003) ("courts presume that directors have acted in good faith") (citation omitted); *see also* FLA. STAT. § 607.0831 (a director will generally not be "personally liable for monetary damages to the corporation or any other person for any statement, vote, decision, or failure to act, regarding corporate management or policy").  Plaintiff therefore recognized that the interests of Bancorp were not served by continuing to pursue these claims.

The resolution of the Securities Action confirmed this point.  To begin with, the plaintiffs in the Securities Action expressly abandoned, and the Court entered summary judgment in

defendants' favor on, the accounting fraud and loan loss reserve claims that permeate the complaint in this action. Then, after a six week jury trial in the Securities Action during which the testimony uniformly rejected the claims advanced in this case, the jury found for the defendants on the majority of the issues. And, ultimately, the Court in the Securities Action entered judgment in favor of defendants based on a failure of proof as to damages and causation.

>    **D.    The Settlement**

On July 8, 2009, the parties advised the Court this case had settled subject to notice to shareholders and approval of the Court. *See* DE 58. On August 24, 2009, the parties filed a Joint Motion for Preliminary Approval of the proposed settlement. *See* DE 71. On September 30, 2009, the Court rendered and entered its Preliminary Approval Order, granting preliminary approval of the settlement, directing notice to shareholders and setting a final approval hearing for November 20, 2009. *See* DE 80.

On November 13, 2009, the parties filed a Joint Motion for Final Approval of Settlement. *See* DE 84. The final approval hearing occurred on November 20, 2009. Counsel for Plaintiff, Defendants and a single objector, Albert R. Feldman, appeared at the final approval hearing. The Court then took the motion for final approval under advisement. On November 25, 2009, the Court overruled the objections to the settlement lodged by Mr. Feldman. *See* DE 89.

On November 30, 2009, Defendants advised the Court that, following the final approval hearing, Defendants identified emails between certain BankAtlantic employees — which had been produced in the Securities Action — Defendants believed Plaintiff should review prior to a ruling on final approval. *See* DE 91. Defendants requested the Court delay ruling on the Joint Motion for Final Approval of Settlement until such time that Plaintiff counsel had received and reviewed the produced documents, and the parties determined how to proceed. The Court granted that request the same day. *See* DE 92.

On December 11, 2009, the parties informed the Court they had reached an agreement whereby Defendants would produce to Plaintiff's counsel all of the discovery materials and depositions transcripts in the Securities Action. In accordance with the parties' agreement, Defendants provided to Plaintiff's counsel almost two million pages of documents produced and twenty eight transcripts of depositions taken in the Securities Action. Plaintiff's counsel completed a diligent review of the documents and deposition transcripts produced.

Trial in the Securities Action began on October 12, 2010 and the jury returned its verdict on November 18, 2010. The verdict returned was mainly in Defendants' favor, finding no

liability as to Defendants Jarett Levan, Abdo and White.   The jury found liability as to Defendants Alan Levan and BankAtlantic on a limited number of statements, as to Toalson on a single statement, and awarded damages arising from those statements.   On April 25, 2011, the Court granted Defendants' Motion for Judgment as a Matter of Law as to all Defendants and all claims finding, *inter alia*, the evidence at trial did not support the jury's verdict.

Based on the facts and law above and below, this Court should approve the settlement.

## III.    MEMORANDUM OF LAW

### A.    The Standards For Judicial Approval Of Derivative Settlements

#### 1.    The law favors settlement.

There is a strong policy favoring compromises that resolve litigation.  *Williams v. First Nat'l Bank*, 216 U.S. 582 (1910); *see also In re NVIDIA Corp. Deriv. Litig.*, No. 06cv6110, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) ("There is an overriding public interest in settling and quieting litigation.") (citations omitted).  This is especially true with respect to "class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."  *In re GMC Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 784 (3d Cir. 1995).   For derivative actions, which are "notoriously difficult and unpredictable," settlements are particularly favored.  *In re AOL Time Warner, Inc. Shareholder Deriv. Litig.*, No. 02cv6302, 2006 WL 2572114, at *3 (S.D.N.Y. Sep. 6, 2008) (citations omitted); *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986) (stating that settlements of derivative actions are "favored for the reasons that settlements generally are favored: disputes are resolved; the resources of litigants and courts are saved; and, in the case of a derivative action, management can return its attention and energy from the courtroom to the corporation itself").

#### 2.    The Court's role in approval of a derivative settlement.

The settlement of a derivative action requires court approval.  *See* Fed. R. Civ. P. 23.1.  In this regard, the court is to determine whether a settlement is fair, reasonable and adequate.  *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 537 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990).   A proposed settlement enjoys a strong presumption that it is fair, reasonable and adequate if — as is the case here — it is the product of extensive, arm's-length negotiations conducted by capable counsel who are well-experienced in class and derivative actions.  *See In re EVCI Career Colleges*

*Holding Corp Securities Litig.*, No. 05cv10240, 2007 WL 2230177, at *4 (S.D.N.Y. Jul. 27, 2007); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981). Moreover, "where the settlement previously has been preliminarily approved, the settlement is presumptively reasonable and an objector must overcome a heavy burden to demonstrate its unreasonableness." *In re Terazosin Hydrochloride Antitrust Litig.*, No 99mdl1317, 2005 WL 2451960, at *5 (S.D. Fla. Jul. 8, 2005) (citations omitted); *Ass'n for Disabled Americans v. Amoco Oil Co.*, 211 F.R.D. 457, 471 (S.D. Fla. 2002) (same). In analyzing any settlement that requires court approval, the court must take into account "the strong judicial policy favoring settlement as well as . . . the realization that compromise is the essence of settlement." *Bennett*, 737 F.2d at 986.

In determining whether a settlement is fair, reasonable and adequate, the court considers relevant factors, including (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement would be deemed fair, adequate and reasonable; (4) the complexity, expense and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Bennett*, 737 F.2d at 986; *Sterling v. Stewart*, 158 F.3d 1199, 1204 (11th Cir. 1998). The standards for approval of class and derivative actions appear to be the same. *See In re United Health Group Inc. Shareholder Derivative Litig.*, No. 06cv1216, 2009 WL 1929308, at *2 (D. Minn. Jul. 6, 2009) (citations omitted).

These factors need not be applied formalistically; rather, the fairness of a settlement is left to the sound discretion of the district court and will not be overturned absent a clear showing of abuse of that discretion. *See Sterling v. Stewart*, 158 F.3d 1199, 1204 (11th Cir. 1998); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). Therefore, in exercising its discretion:

> the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). In evaluating these considerations, the court must not try the case on the merits. *Ass'n for Disabled*

*Americans*, 211 F.R.D. at 467 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). Rather, the court "must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'" *Ass'n for Disabled Americans*, 211 F.R.D. at 467.

### B.    The Court Should Approve the Settlement

Applying the foregoing criteria, there can be no question that the proposed settlement in this case is fair, reasonable and adequate, and in the best interests of Bancorp and its shareholders.

#### 1.    There is no collusion among the parties.

The process that led to the settlement was undeniably fair. This case had been pending for over two and a half years. During that time, Plaintiff conducted pre- and post-filing investigations of the derivative claims and the events and transactions underlying those claims, including, but not limited to, inspection, review and analysis of Bancorp's relevant public filings. The parties also filed extensive legal memoranda with respect to Defendants' motion to dismiss the Complaint. After Defendants filed an Answer, Plaintiff deposed Bancorp's President, its current and former Chief Financial Officers, and its former Executive Vice President of Commercial Real Estate for the relevant time period. Defendants deposed the Plaintiff, D.W. Hugo. Since the close of discovery, the parties had been preparing motions for summary judgment and for trial.[3]

The settlement itself is the culmination of good faith, arm's-length bargaining among sophisticated practitioners, with the assistance of an experienced mediator. The settlement also does not provide for any sort of monetary consideration or for the payment of attorneys' fees, further establishing the appropriate nature of the relationship. *See In re Zoran Corp. Derivative*

---

[3] The fact that Plaintiff did not originally obtain document discovery in this case — though Plaintiff has since been granted access to the millions of pages of documents produced in the Securities Action — is of little moment with respect to the settlement. Courts have repeatedly rejected the notion that the "too little discovery" objection is a valid basis to reject a settlement. *See, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1332 (5th Cir. 1977) (affirming approval of settlement and noting that "that very little formal discovery was conducted and there was no voluminous record in the case. However, the lack of such does not compel the conclusion that insufficient discovery was conducted."); *Francisco v. Numismatic Guaranty Corp.*, No. 06cv61677, 2008 WL 649124, at *11 (S.D. Fla. Jan. 31, 2008) (approving settlement and overruling objection for lack of discovery); *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1316-17 (S.D. Fla. 2005) (same).

*Litig.*, No. 06cv05503, 2008 WL 941897, at *2 (N.D. Cal. Apr. 7, 2008) (noting that collusive settlements typically entail handsome attorneys' fees to plaintiff's counsel as *quid pro quo* for broad releases and disposal of troublesome claims).  These facts confirm an absence of collusion.

          2.    <u>There are significant risks with continued litigation, reducing the likelihood of success at trial.</u>

The risks associated with continuing the litigation are significant.  Derivative actions are notoriously complex and expensive to prosecute.  *See, e.g., In re AOL Time Warner*, 2006 WL 2572114, at *3 (approving a derivative settlement and noting that "shareholder derivative actions are notoriously difficult and unpredictable") (citations omitted); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (affirming the approval of a derivative action settlement and noting that the "odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful").  Indeed, had Plaintiff continued to litigate this case, he would have faced a host of potential risks and costs, including the potential for successful attacks against the pleadings, the high costs associated with lengthy and complex litigation, potential loss at the summary judgment stage, and the inherent risks of trial should the case progress that far.  Even a favorable judgment at trial would have undoubtedly resulted in numerous post-trial motions. And, even if liability were established, the amount of recoverable damages would have been uncertain.  There is a genuine risk of no recovery at all, even after years of litigation.

Indeed, Plaintiff, in order to prevail, would have had to overcome the protections afforded the Board under the so-called "business judgment rule."  Although referred to as a "rule," the idea of "business judgment protection" for directors is more akin to a broad doctrine or concept, and it is perhaps, the fundamental precept of corporate law.  *See generally In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). While the business judgment rule (and the protections it affords directors) has been articulated in slightly varied ways (and has taken varied forms), it essentially stands for the proposition that there is strong presumption that, in making a disinterested business decision, the directors of a corporation acted on an informed basis, in good faith, and with the honest belief that the action taken was in the best interests of the corporation.  *Disney*, 907 A.2d at 746-47.  In short, the prospect that Defendants could have been shielded by this protective umbrella made establishing liability even more unlikely.

Plaintiff's task was recently made all the more difficult because of the judgment entered in favor of the defendants in the Securities Action. Not only did the jury find for the defendants on the majority of the issues in the Securities Action, but the Court also ultimately found there to be a failure of proof as to loss causation of damages.  These findings would have made it very difficult for this Plaintiff to prevail in this case.

The settlement eliminates these and other risks of continued litigation.  Similarly, by reaching a settlement, Defendants avoid the significant risks and costs of litigation, including the costs associated with continued litigation, potential liability and damages exposure. More importantly, the settlement allows Defendants to end the distraction that arises from litigation and the corresponding drain on resources, and focus on running their business. The settlement also allows the Nominal Defendant to focus its efforts on defending against the appeal in the Securities Action.  All of these concerns militate in favor of approval of the settlement.

3.      This case is complex, expensive and lengthy.

Along these same lines, the complexity, expense and duration of the litigation also favor approval of the settlement. Continuing this litigation would require the resolution of numerous complex issues of law, at the cost of considerable time and expense to the parties and the Court. For example, given the number of individual Defendants, the summary judgment motions alone would impose a tremendous expense and time burden. And those burdens would only increase with a trial. *See AOL Time Warner*, 2006 WL 2572114, at *5 ("this litigation boasts numerous defendants, multiple claims, and complex factual issues; the prosecution of this Action would require the Company to incur substantial costs. Termination of the litigation at this stage of the proceedings obviates the expenditure of any future time and expense in connection with this action," and will allow the Company to direct its full attention to its substantive business).

4.      The settlement terms are appropriate.

The settlement in this case provides for an exchange of mutual releases and a dismissal with prejudice of all claims against all Defendants.  There is no additional consideration, monetary or otherwise, for the settlement.  As explained below, for this particular case, this settlement is eminently reasonable and appropriate.

To begin with, the settlement confers significant benefits on Plaintiff and Defendants, as well upon Bancorp and its shareholders.  Indeed, non-monetary settlement benefits may support

-10-

approval of a settlement. *See Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) ("non- pecuniary benefits to the corporation may support a settlement"). As indicated above, the settlement eliminates the numerous risks, costs and burdens of litigation for everyone. Defendants, to be sure, enjoy the significant benefits that flow from resolving the claim, and thus eliminating the remote possibility of an adverse judgment. Defendants also enjoy the costs and time savings benefits from ending the litigation now, as well as the security of a release for any and all claims that could have been brought in this case.

The benefit to Plaintiff is equally tangible. Plaintiff enjoys the same cost and time saving benefits as Defendants, as the settlement will obviate the need for further litigation expense. Plaintiff also gets a release for any claims that could have brought with respect to the prosecution of the claim, including a potential statutory claim for attorneys' fees and costs incurred by Defendants in defending against the claims.

More importantly, Plaintiff, in his derivative capacity representing the interests of Bancorp and its other shareholders, secures the benefit of freeing company resources that otherwise would have been spent on this case. In that regard, Bancorp will now be able to focus its efforts on what is really important — managing its substantive business in this most challenging economic environment. Moreover, Bancorp will be able to re-allocate its litigation resources toward defending against the appeal in the Securities Action.

The benefits flowing from the settlement are of particular value when compared to the strength of the claims in this case. Indeed, "[i]n evaluating the fairness, reasonableness and adequacy of a settlement, the court is primarily concerned with the strength of the case for plaintiffs on the merits balanced against the amount offered in settlement." *In re AOL Time Warner*, 2006 WL 2572114, at *3 (citation omitted). These factors as well compel final approval of the settlement.

As set forth in above, the deposition testimony in this case and trial testimony from the Securities Action provide a cogent explanation that refuted the claims in this case. Accordingly, the likelihood of Plaintiff's success at trial and on appeal was minimal. The likelihood of success when measured against the risks posed by continued litigation is stark. The likelihood of success is minimal at best, while the corresponding risks are significant. Viewed in this light, the settlement terms are not only appropriate, but also exactly what is required in a case of this sort.

-11-

The relevant case law supports this conclusion.  *In re Fleet/Norstar Securities Litig.*, 935 F. Supp. 99 (D.R.I. 1996), which involved that court's dual analysis of separate settlements of a securities class action and a shareholder derivative action, is particularly instructive.  The nature of the claims is strikingly familiar:

> The plaintiffs' claims were based on Defendants' alleged gross mismanagement of Fleet's loan portfolios . . . The origin of both actions is the serious deterioration of real estate values in the New England area that occurred in the second half of 1989 and continued into 1990. One of the consequences was an increase in the number and amount of delinquent bank loans to developers and purchasers of real estate.

935 F. Supp. at 103.  The substance of the plaintiffs' core assertion is similarly comparable:

> Fleet's management misrepresented to the investing public that the Company was a highly successful banking operation which had deftly managed to avoid the abyss of the deteriorating New England real estate market into which other banks had fallen.

*Id.*   And, the court's concluding remarks about the case also prove to be equally applicable to this case:

> The Court is well aware that this litigation was protracted and complex. Yet, it is worth remembering that the true genesis of this litigation was an unfortunate downturn of the real estate economy in New England. Perhaps the injuries alleged by the stockholders in this case are attributable only to the economic downturn.

*Id.* at 117.

Against this backdrop, the parties in *Fleet/Norstar* entered into a "clear sailing agreement." *Id.* at 104. That is, in exchange for an award of attorney's fees and reimbursement of expenses in total amount not exceeding $499,000, which Defendant agreed to pay, the plaintiffs agreed to end the case.  *Id.*  In evaluating and approving the settlement, the court first determined that the "settlement is voluntary," with "no evidence of coercion or outright collusion." *Id.* at 111.  The court then determined that such a clear sailing agreement, even with a payment of attorneys' fees to plaintiffs' counsel, "does not offend state or federal statutes, nor the Constitution." *Id.*

With respect to the substantive terms of the settlement, specifically the lack of monetary or non-monetary consideration, the court in *Fleet/Norstar*, in approving the settlement but refusing to award attorneys' fees, noted that "the most important factor is the strength of the case for the plaintiffs on the merits, balanced against the amount offered in settlement." *Id.* at 111 (citations omitted).  In that regard, the court noted that "[t]he merits of the derivative action were tenuous at best." *Id.*  The court further observed:

-12-

> While a brief evaluation of the claims leads the Court to seriously doubt the value of the plaintiffs' derivative action, approval of the settlement is warranted. The proposed settlement offered by Fleet obviously does not provide for a payment of damages to itself. It includes only the option of payment of Plaintiff's attorneys' fees. This is the only possible financial recovery available to Plaintiff. For reasons discussed below, the Court declines to award attorney fees to derivative Plaintiff counsel. Therefore, Fleet is not required to pay anything to Plaintiffs. A settlement which includes only the possibility of the payment of attorney fees is fair, adequate and reasonable in light of the weak claims presented by Plaintiff.

*Id.* at 112. Later, the court notes that the business judgment rule would likely bar recovery in any event. *Id.* at 114-15.

This *Fleet/Norstar* logic and analysis applies with equal weight to this case. Applying that analysis in this case should yield a similar result — approval of the settlement. *See also, e.g., Granada Investments, Inc., DWG Corp.*, 962 F.2d 1203, 1206 (6th Cir. 1992) ("Admittedly, the fairness of a settlement is more difficult to determine when nonpecuniary benefits are provided to the corporation. Nonetheless, [the corporation] was released from all liability based on claims that might have been asserted").

The settlement is well within the range of possible recovery. In light of the factual record in this case, this Plaintiff might very well lose at summary judgment or trial. Even if Plaintiff was successful in establishing liability, to establish damages at trial, he would have had to prove, *inter alia*, that the claims actually caused Bancorp to suffer damages and that the individual Defendants, as a matter of law, could be held liable for those damages. The damages issue would have been both hotly disputed and uncertain. It is certainly conceivable — and probably likely given the Court's and jury findings in the Securities Action — that the finder of fact could find that there were no damages in this case. Thus, the amount of recovery could easily be zero.[4]

Moreover, "the determination of a reasonable settlement is not susceptible of a mathematical equation yielding a particularized sum." *Arambaru v. Healthcare Fin. Servs., Inc.*, No. 02cv6535, 2009 WL 1086938, at *4 (E.D.N.Y. Apr. 22, 2009) (citation omitted). There is, rather, "a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689,

---

[4] It is also clear that even a victory at trial is no guarantee that a judgment would ultimately be sustained on appeal. Substantial judgments awarded by trial courts have been reversed on appeal. *See, e.g., In re Apple Computer Sec. Litig.*, No. 84cv20148, 1991 WL 238298 (N.D. Cal. Sep. 6, 1991) ($100 million jury verdict in favor of plaintiff overturned and j.n.o.v. entered in favor of defendant); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial).

693 (2d Cir. 1972).  "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate . . . there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Arambaru*, 2009 WL 1086938, at *4 (citations omitted); *see also Officers for Justice*, 688 F.2d at 624 ("the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.") (citations and internal quotations omitted).   Given the obstacles and uncertainties inherent here, the settlement terms are appropriate and reasonable.

> 5.  <u>The litigation is at an advanced stage.</u>

The advanced stage of this litigation further supports approval.  The case is now nearly three years old.  Discovery has concluded.  Vigorous and contentious motion practice has been present from the beginning, including a motion to dismiss and numerous discovery related motions.

The settlement comes on the heels of extensive arm's length negotiations, some of which were overseen and assisted by mediator Mark Buckstein.  Even after reaching an agreement in principle, the parties had continued meaningful discussions to reduce the settlement to writing.  The negotiations commenced near the time when the parties would soon be filing motions for summary judgment, and then preparing for trial. Consequently, "the parties and the Court are well placed to assess the strength of this case and the comparative benefits of the proposed settlement."  *Fresco v. Auto Data, Inc.*, No. 03cv61063, 2007 WL 2330895, at *6 (S.D. Fla. May 14, 2007).   This is particularly true in light of the resolution of the Securities Action on post-trial motions.

> 6.  <u>The parties' experienced counsel support approval of the settlement.</u>

The support for this Settlement from the parties' counsel also weighs in favor of approval. Experienced counsel operating at arm's length have weighed all of the foregoing factors and endorse the proposed settlement.  As the courts have explained, the view of the attorneys actively conducting the litigation is "entitled to significant weight."  *Fisher Bros. v. Cambridge-Lee Indus., Inc.*, 630 F. Supp. 482, 488 (E.D. Pa. 1985). "The unanimous support of counsel for this settlement weights strongly in favor of its approval."  *Fresco*, 2007 WL 2330895, at *6; *In re NVIDIA Corp.*, 2008 WL 5382544, at *4 ("significant weight should be attributed to counsel's belief that settlement is in the best interests of those affected by the settlement").

Here, counsel are seasoned practitioners in this specialized area of the law, with many years of experience representing plaintiffs and defendants in complex securities, shareholder and corporate litigation.  These attorneys have considered the relative strengths and weaknesses of their respective cases and have reached the agreement embodied in the Stipulation of Settlement, and all believe it is a very good result and recommend its approval.

7.      The reaction of BankAtlantic Bancorp's shareholders supports approval.

As recounted above, pursuant to the terms of the Preliminary Approval Order, the Notice was published on the Business Wire and in The Wall Street Journal, posted on BankAtlantic Bancorp's website, and filed on a Form 8-K with the SEC.  Despite there being nearly fifty million outstanding shares held by thousands of stockholders, there had been but one objector — Feldman — to the settlement. And, as this Court is well aware, Feldman and his counsel are anything but objective and unbiased when it comes to this particular settlement, and its corresponding implications for Feldman's state court action.

The lack of objections "militates strongly in favor of the Court finding that the proposed settlement should be approved." *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1332 (S.D. Fla. 2001).  Indeed, "the reaction of the class to the proffered settlement is perhaps the most significant factor to be weighed in considering its adequacy." *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990).  A small number of objections is convincing evidence of a proposed settlement's fairness and adequacy. *See, e.g., Rome v. Archer*, 197 A.2d 49, 58 (Del. 1964) (approving settlement agreement which was ratified by a very large majority of the stockholders); *Chiulli v. Hardwicke Cos.*, No. 6929, 1985 WL 11532, at *1 (Del. Ch. Feb. 11, 1985) (in the absence of objection, approval of settlement "would be almost perfunctory").

Here, in this age of increased shareholder activism, the silent support for the settlement from BankAtlantic Bancorp's shareholders' is a strong indication of its fairness, reasonableness and adequacy.

**C.      The Lone Objection Should Be Overruled**

Albert Feldman — the named plaintiff in the Feldman Action — was the lone objector to this proposed settlement when it was first submitted to the Court back in 2009.  Since then, the grounds for overruling the objection have only gotten stronger. Indeed, Feldman has not done a single thing to advance the Feldman Action, despite having given notice of an intent to do so

nearly two years ago.  And, Feldman's complaints about the propriety of the settlement are now easily dismissed given what has since transpired in this case and the Securities Action.

Furthermore, in denying Feldman's motion to intervene and granting preliminary approval of the settlement, this Court has already necessarily addressed and rejected Feldman's arguments.[5] Thus, "where the settlement previously has been preliminarily approved, the settlement is presumptively reasonable and an objector must overcome a heavy burden to demonstrate its unreasonableness." *In re Terazosin Hydrochloride Antitrust Litig.*, 2005 WL 2451960, at *5 (citations omitted); *see also Ass'n for Disabled Americans v. Amoco Oil Co.*, 211 F.R.D. 457, 471 (S.D. Fla. 2002) ("where, as here, the consent decree previously has been preliminarily approved, the decree is presumptively reasonable, and an objector must overcome a heavy burden") (citations and internal quotations omitted). Feldman has not come close to meeting this heavy burden, particularly since the exact same objections were made at the preliminary approval stage.

In denying his motion to intervene, this Court framed the context of Feldman's issues:

> Feldman knew about his interest in the Federal Action, and its potential effect on his State Action, as early as October 1, 2008, and even negotiated for a stay of the State Court action pending the outcome of the Federal Action. However, he did not seek to intervene until July 8, 2009 — nearly nine months later and seven days after the Plaintiff and Defendants reached a settlement agreement that he objects to. Thus, it appears to the Court that Feldman deliberately chose to stay his State Action to wait and see what would happen in the Federal Action, sat on the sidelines for nearly nine months, and only chose to get involved in the Federal Action when he disagreed with the direction the Federal Action was taking.

Order on Motion for Intervention, DE 73 (Sep. 2, 2009), at 2-3 (citations omitted).  In the same Order, with respect to Feldman's objection that this Plaintiff is inadequate, the Court rejected the patent speculation underlying the argument:

> Feldman argues that BankAtlantic's interests have not been adequately represented because the Federal Action Plaintiff took only deposition testimony before settling the case. A disagreement with the view of the case or litigation tactics, however, does not mean BankAtlantic's interests are not adequately represented. Feldman's arguments about what formal written discovery would have shown is speculation.

---

[5]  The Parties have also previously addressed those same arguments. The following memoranda are, therefore, incorporated herein: Plaintiff's Response to Albert R. Feldman's Motion to Intervene and Stay Proceedings (DE 64); Defendants' Memorandum in Opposition to Albert R. Feldman's Motion to Intervene and Stay Proceedings (DE 65); and the Parties' Reply Memorandum in Support of Joint Motion for Preliminary Approval of Settlement (DE 74).

Order on Motion for Intervention, DE 73 (Sep. 2, 2009), at 3-4. Combined with the facts revealed during discovery, these rulings apply with equal weight toward overruling Feldman's latest (yet identical) objections to approval of the settlement.

Feldman's argument that the settlement is a product of collusion is particularly unavailing. Given the gravity of such an accusation, "courts presume the absence of fraud or collusion, unless there is evidence to the contrary." *Bailey v. AK Steel Corp.*, No. 06cv468, 2008 WL 495539, at *4 (S.D. Ohio Feb. 21, 2008) (citations omitted), *aff'd*, 320 Fed. Appx. 364 (6th Cir. 2009); *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006); *see also* NEWBERG ON CLASS ACTIONS § 11.51 (4th ed. 2002) ("Courts are to presume the absence of fraud or collusion in negotiating a settlement, unless evidence to the contrary is offered."). Here, Feldman has not offered any evidence of collusion, relying instead on conclusory assertions and non-existent inferences.

In fact, Feldman's objection, like its predecessor, does not contain a single affirmative statement of fact to support his collusion accusation. He, instead, offers nothing more than the supposedly "strong inference that the threat of having to pay defendants' attorneys' fees colored the Federal Derivative Plaintiff's prosecution of this case." Objections at 6. This is incorrect. But, even if the threat of fees did somehow color the prosecution of the case, that would not lead inexorably to the conclusion that the settlement is a product of collusion; to the contrary, because it says nothing about Defendants, their counsel or even the settlement itself, it is of little if any probative value in establishing collusion.

The history of this case further evidences the lack of collusion. The parties and their counsel have displayed civil yet pronounced and vigorous disagreement over the core issues in this case, both substantive and procedural. Furthermore, at the mediation and thereafter, the settlement process has been entirely at arm's length, with each side representing and pursuing its own interests, and exercising independent judgment. As Feldman well knows, the mediation itself was closely supervised by the Court appointed, and well respected, mediator Mark Buckstein.

Moreover, the terms of the settlement confirm the absence of collusion. "The authorities hold that if the settlement agreement itself is fair, reasonable and adequate, then the court may assume that the negotiations were proper and free of collusion." *Leonhardt v. Arvinmeritor, Inc.*, 581 F. Supp. 2d 818, 838 (E.D. Mich. 2008) (citation omitted). In addressing this particular

-17-

factor, courts tend to "look to whether (1) the named plaintiffs' claims are treated more favorably than other plaintiffs' claims, and (2) the fee agreement suggests collusion." *IUE-CWA*, 238 F.R.D. at 599 (citations omitted). *See also In re Zoran Corp. Deriv. Litig.*, No. 06cv5503, 2008 WL 941897, at *2 (N.D. Cal. Apr. 7, 2008) (noting that collusive settlements typically entail handsome attorneys' fees to plaintiff's counsel as *quid pro quo* for broad releases and disposal of troublesome claims). Considering that this settlement provides no preference to the named Plaintiff nor attorneys' fees for counsel, the settlement agreement must be found not to be a product of collusion, and it should be approved.[6]

Feldman's argument that Defendants' counsel is conflicted out of representing Bancorp and the individual Defendants is premised on a gross misreading of the applicable law and the circumstances of this case. *Stepak v. Addison*, 20 F.3d 398 (11th Cir. 1994), the case upon which Feldman principally relies (though without much in the way of analysis), is distinguishable on its face. Therein, the Court made absolutely clear from the outset of its opinion that the conflict for the law firm only arose because of its prior representation of the individual directors — as opposed to the company itself — in a *criminal* investigation. *See id.* at 403-06. Indeed, at the beginning of the discussion regarding the conflict of interest issue, the Court expressly limits the definition of a "conflicted law firm" as follows:

> We use the term in a broader sense to designate any law firm that undertakes to provide legal services, whether investigatory or advisory, to a corporation in connection with a shareholder derivative demand, after having represented an alleged wrongdoer in a *criminal* investigation involving subject matter that overlaps with that of the demand.

*Id.* at 404 n. 3 (emphasis added). Later, in summarizing its ruling, the Court again reemphasizes the fact that the conflicted law firm represented the "alleged wrongdoer in *criminal* proceedings." *Id.* at 407 (emphasis added). Thus, the Court's holding, which it expressly

---

[6] Feldman's complaints about the release language in the settlement also fail as a matter of law. "[F]ederal class action settlements containing a release of state law claims are both common and presumptively valid." *Amoco Oil Co.*, 211 F.R.D. at 471 (citations omitted). Such releases "typically are broad in scope" and routinely waive future claims. *Id.* (citations omitted). Moreover, by agreeing to stay his state court case in favor of this case, Feldman expressly contemplated the *res judicata* implications. And, although he argues that the four additional defendants in the state court action warrants altering the release language of the settlement in this case, Feldman provides no legal authority to support this argument. Indeed, there is none, as a crafty lawyer could always retain some piece of a claim by intentionally omitting certain directors or officers as defendants in a derivative case.

-18-

describes as "a limited one," does not compel a similar result in this case. *Id.* at 411. Furthermore, for the reasons set forth *infra, Klein* does not alter this conclusion, as the case is distinguishable on its face.

*Stepak* further establishes that a court, in addressing the conflict issue, must also take into account whether the claims have merit. On the one hand, "if the derivative suit is meritorious, the interests of the corporate entity and the interests of the insider defendants are likely to be directly adverse." *Id.* at 404. If, on the other hand, as is the case here, the derivative suit has minimal chance of success, then "the corporation's and the alleged wrongdoers' interests will be aligned; both will want the derivative suit to be terminated." *Id.* In that circumstance, where the interests are aligned, there is no conflict. This is particularly true where, like here, there is no evidence suggesting that counsel could not "exercise independent professional judgment." *Id.* at 404-05 (citation omitted).

Feldman next relies upon *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993), citing it for his lead proposition that "a firm's dual representation of the Board and Company creates an inherent conflict of interest." Objections at 7-8. Amazingly, however, Feldman did not see fit to inform this Court that the Third Circuit in *Bolger* actually affirmed the lower court ruling allowing dual representation of the corporate and individual defendants. *Bolger*, 2 F.3d at 1317 ("We do not believe the district court abused its discretion in allowing common counsel here."). In so ruling, the Third Circuit, like the Eleventh Circuit in *Stepak*, took into account the underlying nature and validity of the claim, noting the ABA's statement that "[m]ost derivative actions are a normal incident of an organization's affairs, to be defended by the organization's lawyers like any other suit." *Id.* at 1316 (citation omitted). Here, as evidenced by the factual record set forth above, the derivative claim in this case does not rise to a level where separate counsel would be required.[7]

_____

[7] Equally unavailing to Feldman are *Klein v. FPL Grp., Inc.*, No. 02cv20170, 2004 WL 302292 (S.D. Fla. Feb. 5, 2004), and *In re Oracle Sec. Litig.*, 829 F. Supp. 1176 (N.D. Cal. 1993). *Klein*, which Feldman cites for the conflict arguments, dealt with whether a board appointed evaluation committee was sufficiently independent under a totality of the circumstances test not applicable here. One of the factors Judge Gold considered in concluding that the committee was not sufficiently independent was its selection of law firms as counsel to the committee. *Klein*, 2004 WL 302292, at *22. Judge Gold, however, was presented with a legion of evidence and arguments on the conflict issue. *Id.* There are no such evidence or arguments in this case.

Moreover, putting aside the case law, Feldman has set forth no concrete evidence establishing that there was any sort of conflict to speak of. Nor does his state court complaint make any allegations regarding any conflict of interest being at the root of Bancorp's refusal to comply with his shareholder demands. The plain truth, of course, is that there is no conflict and this is but another example of overzealous advocacy, unburdened by any recitation of fact.

In sum, although Feldman has objected to the approval of the settlement, he does not — and could not — directly challenge any of the now undisputed facts supporting approval of that settlement. In fact, Feldman is unable to point to a single shred of evidence that would support any claim against any of the Defendants. Nor does Feldman offer any meaningful challenge to the parties' corresponding legal analysis of the relevant facts under Rule 23.1. Instead, having chosen to both sit on the sidelines and decline to take the time to watch what was happening on the field, Feldman offers only rank speculation and Monday-morning quarterbacking as to what *might have* been discovered if only he *could have* litigated this case. As this Court has previously recognized, such does not present a sufficient factual or legal basis for refusing to approve a settlement. The objection should be overruled.

## IV.    CONCLUSION

For the foregoing reasons and on the foregoing authorities, the Court should grant this motion, and enter the proposed Final Approval Order and Judgment of Dismissal With Prejudice.

---

*Oracle* presented a unique situation where a nominal defendant corporation and the individual defendants were jointly represented by an outside law firm as well as the corporation's in-house general counsel. The Court specifically found that the "role played by Oracle's general counsel in this litigation is distressingly ambiguous." *Id.* at 1188. That particular circumstance, not present here, principally led to the ruling that the dual representation was inappropriate. The Court also took issue with the attorney fee payment to plaintiff's counsel, which it found to make "the derivative settlement reek of collusion." *Id.* at 1189. That is also not an issue in this case.

Respectfully Submitted,

NIX, PATTERSON & ROACH, LLP
3600 B. North Capital of Texas Highway
Suite 350
Austin, TX 78746
Telephone:     (512) 328-5333
Facsimile:     (512) 328-5335

s/ Jeffrey J. Angelovich
JEFFREY J. ANGELOVICH

*Attorneys for Plaintiff*
*(additional counsel listed on service list)*


STEARNS WEAVER MILLER
WEISSLER  ALHADEFF &
    SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone:  (305) 789-3200
Facsimile:   (305) 789-3395

s/ Eugene E. Stearns
EUGENE E. STEARNS
Florida Bar No. 149335
estearns@stearnsweaver.com
RICHARD JACKSON
Florida Bar No. 898910
rjackson@stearnsweaver.com
ADAM M. SCHACHTER
Florida Bar No. 647101
aschachter@stearnsweaver.com
GORDON M. MEAD, JR.
Florida Bar No. 49896
gmead@stearnsweaver.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on June 27, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF or other approved means.

<u>s/ Gordon M. Mead, Jr.</u>
GORDON M. MEAD, JR.

**SERVICE LIST**

*D. W. Hugo v. Alan B. Levan, et al.*
CASE NO. 08-61018-CIV-UNGARO
United States District Court for the Southern District of Florida

James P. Gitkin
Eric T. Salpeter
SALPETER GITKIN, LLP
Museum Plaza - Suite 503
200 South Andrews Avenue
Fort Lauderdale, FL 33301
Tel: (954) 467-8622
Fax: (954) 467-8623
*Attorneys for Plaintiff*

Jeffrey J. Angelovich
NIX, PATTERSON & ROACH, LLP
3600 B. North Capital of Texas Highway
Suite 350
Austin, TX 78746
Tel: (512) 328-5333
Fax: (512) 328-5335
*Attorneys for Plaintiff*

Bradley E. Beckworth
Susan Whatley
Brad Seidel
NIX, PATTERSON & ROACH, LLP
205 Linda Drive, PO Box 769
Daingerfield, TX 75638
Tel: (903) 645-7333
Fax: (903) 645-5389
*Attorneys for Plaintiff*

John C. Goodson
KEIL GOODSON, P.A.
406 Walnut Street
PO Box 618
Texarkana, AR 71854
Tel: (870) 772-4113
Fax: (870) 773-2967
*Attorneys for Plaintiff*

Kenneth Vianale
VIANALE & VIANALE, LLP
2499 Glades Road, Suite 112
Boca Raton, FL 33431
Tel: (561) 392-4750
Fax: (561) 392-4775
*Attorneys for Objector Feldman*

#1044953 v5