## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-61018-CIV-UNGARO

D.W. HUGO, Derivatively on behalf of
Nominal Defendant BANKATLANTIC
BANCORP, INC.,

      Plaintiff,

v.

ALAN B. LEVAN, JARETT S. LEVAN,
JAY C. MCCLUNG, MARCIA K. SNYDER,
VALERIE TOALSON, JAMES A. WHITE,
JOHN E. ABDO, D. KEITH COBB, STEVEN
M. COLDREN and DAVID A. LIEBERMAN,

      Defendants,

and

BANKATLANTIC BANCORP, INC.,

      Nominal Defendant.
_____/

## ORDER GRANTING FINAL APPROVAL OF SETTLEMENT AND DISMISSING ACTION

THIS CAUSE is before the Court upon the Joint Motion for Final Approval of

Settlement, filed June 27, 2011.  (D.E. 127.)

THE COURT has considered the Motion and the pertinent portions of the

record and is otherwise fully advised in the premises.

# I. Background

On July 2, 2008, Plaintiff D.W. Hugo filed a Verified Shareholder Derivative Complaint against Nominal Defendant BankAtlantic Bancorp, Inc.[1] ("Bancorp"), and Defendants Alan B. Levan, Jarett S. Levan, Jay C. McClung, Marcia K. Snyder, Valerie Toalson, James A. White, John E. Abdo, D. Keith Cobb, Steven M. Coldren, and David A. Lieberman ("Defendants") (collectively, the "Parties"). Plaintiff alleges, *inter alia*, Defendants breached their fiduciary duties by causing Bancorp and its wholly owned subsidiary BankAtlantic to engage in illicit business practices with respect to BankAtlantic's Commercial Real Estate loan portfolio, in contravention of BankAtlantic's lending policies and the standards set forth by lending agencies, and by disseminating false and misleading SEC filings that failed to disclose and properly account for BankAtlantic's loan losses. (D.E. 1, ¶ 2.) The Complaint relies heavily on allegations of misconduct regarding BankAtlantic's loan to Steeplechase Properties, LLC. (D.E. 1, ¶ 3.)

On September 5, 2008, Defendants filed a Motion to Dismiss the Complaint (D.E. 19), which was denied by the Court on December 12, 2008. (D.E. 43.) On January 12, 2009, Defendants filed an Answer and Affirmative Defenses to the Verified Shareholder Derivative Complaint, denying all substantive allegations. (D.E. 46.)

---

[1] For the purpose of providing accurate background information, the Court uses "Bancorp" to refer to the publicly traded Nominal Defendant BankAtlantic Bancorp, Inc. and "BankAtlantic" to refer to Bancorp's wholly owned subsidiary bank by that name. The Court otherwise incorporates by reference the definitions set forth in the Stipulation of Settlement. (D.E. 71-1.)

On July 8, 2009, the Parties advised the Court this case had settled, subject to notice to shareholders and the approval of the Court. (D.E. 58.) On July 8, 2009, Albert R. Feldman, a purported shareholder of Bancorp stock and plaintiff in the action *Feldman v. Levan*, Case No. 08-1077, in the Circuit Court of Broward County, Florida ("State Action"), filed a Motion to Intervene and Motion to Stay Pending Outcome of Related State Court Derivative Case. (D.E. 59.) In his Motion, Mr. Feldman alleged, *inter alia*, that Plaintiff had not adequately represented Bancorp's interests because Plaintiff took only deposition testimony before deciding to settle the case, had not obtained document discovery, and that the appropriate remedy was to stay this case and allow him to prosecute the State Action. (D.E. 59; *see also* D.E. 72, 83.) [2]

On August 24, 2009, the Parties filed a Joint Motion for Preliminary Approval of the proposed settlement, as set forth in the Stipulation of Settlement. (D.E. 71 & 71-2.) On September 30, 2009, the Court issued a Preliminary Approval Order, granting preliminary approval of the settlement; directing notice to shareholders; approving the form, content and method of publication of the Notice; and setting a final approval hearing for November 20, 2009. (D.E. 80.) On November 6, 2011, Mr. Feldman filed an Objection to the Proposed Settlement. (D.E. 83.)

---

[2] On August 26, 2009 and November 6, 2009, Mr. Feldman filed Memoranda in Opposition to the parties' request for preliminary approval, containing his objections to the proposed settlement. (D.E. 72, 83.) The Court denied Mr. Feldman's Motion to Intervene (D.E. 73) and overruled Mr. Feldman's objections (D.E. 89).

On November 13, 2009, the Parties filed a Joint Motion for Final Approval of Settlement (D.E. 84). The Court convened a final approval hearing on November 20, 2009. (D.E. 85.) Counsel for Plaintiff, Defendants, and objector Albert R. Feldman appeared at the final approval hearing. (*Id*.) Mr. Feldman, through counsel, stated his objections to the proposed settlement. (*See* D.E. 85.) The Court took the Motion for Final Approval of Settlement under advisement. (*Id*.) On November 25, 2009, the Court overruled Mr. Feldman's objections to the settlement. (D.E. 89.)

On November 30, 2009, Defendants advised the Court that, following the final approval hearing, Defendants had identified emails exchanged by officers of BankAtlantic—which had been produced in the related securities fraud action, *In re BankAtlantic Bancorp, Inc. Securities Litigation*, No. 07-61542-CV-UNGARO (S.D. Fla.) ("*Hubbard*"). Defendants represented that they believed Plaintiff should review those emails prior to a ruling on final approval of the proposed settlement. (D.E. 91.) Defendants requested the Court delay ruling on the Joint Motion for Final Approval of Settlement until such time that Plaintiff had received and reviewed the *Hubbard* documents and the Parties determined how to proceed. (*Id*.) The Court granted that request the same day. (D.E. 92.)

On December 11, 2009, the Parties informed the Court they had reached an agreement whereby Defendants would produce to Plaintiff all of the discovery materials and deposition transcripts in the *Hubbard* action. (D.E. 94.) The parties requested the Court deny as moot the Joint Motion for Final Settlement Approval

and stay this case until the conclusion of discovery in the securities fraud action. (*Id.*)  The Court granted the requested relief on January 4, 2010.  (D.E. 99.)

On May 6, 2011, the Court held a status conference in this action to determine the Parties' intent in light of the jury's verdict in *Hubbard* and the Court's subsequent Order granting defendants' Motion for Judgment as a Matter of Law as to all Defendants.[3]  (D.E. 123.)  During the conference, Plaintiff's counsel stated that dismissal of certain Defendants would be appropriate given the jury's verdict, and defense counsel stated its intent to move for summary judgment in favor of all other Defendants on all claims.  The Court ordered the Parties to confer on a procedure to effect the matters discussed, to prepare a briefing schedule, and to appear on May 25, 2011 for an additional status conference to advise the Court of the results of the Parties' conference.  (D.E. 122.)

At the May 25, 2011 status conference, the Parties informed the Court of their intent to move forward with the settlement and requested the Court grant final approval of the Settlement.  The Court ordered Plaintiff to file a supplement to the original Motion for Final Approval of Settlement no later than June 6, 2011. (D.E. 124.)  On June 3, 2011, Plaintiff filed a Supplement to Motion for Final

---

[3] Prior to trial in the *Hubbard* action, the class representatives in that case abandoned their accounting fraud and loan loss reserve claims, which are set forth throughout the Complaint in this action.  Consequently, the Court entered summary judgment in favor of the *Hubbard* defendants on those claims.  Trial in the *Hubbard* action began on October 12, 2010 and the jury returned its verdict on November 18, 2010.  The verdict returned was mainly in Defendants' favor, finding no liability as to Defendants Jarrett Levan, Abdo and White.  The jury found liability as to Defendants Alan Levan and Bancorp on a limited number of statements, as to Toalson on a single statement, and awarded damages arising from those statements.  On April 25, 2011, the Court granted Defendants' Motion for Judgment as a Matter of Law as to all Defendants and all claims finding, *inter alia*, the evidence at trial did not support the jury's verdict.

Approval of Settlement, describing the procedural background of this case since July 8, 2009 and providing additional evidence and argument in support of final approval of the Settlement.  (D.E. 125.)

In the instant Motion the Parties jointly move, pursuant to Federal Rule of Civil Procedure 23.1, for final approval of the proposed settlement of this action, which is codified in the Stipulation of Settlement dated August 24, 2009 ("Settlement").  (D.E. 71-1.)

## II.  FINDINGS OF FACT

1.      Plaintiff D.W. Hugo was a shareholder of BankAtlantic at the time this action was filed and has continuously held at least one share of BankAtlantic stock during this action.  (D.E. 1 ¶ 80.)

2.      Plaintiff's Verified Shareholder Derivative Complaint, filed on July 2, 2008, alleges, *inter alia*, Defendants breached their fiduciary duties by causing Bancorp and BankAtlantic to engage in illicit business practices with respect to BankAtlantic's Commercial Real Estate loan portfolio in contravention of BankAtlantic's lending policies, as well as the standards set forth by lending agencies, and by disseminating false and misleading SEC filings that failed to disclose and properly account for BankAtlantic's loan losses.  (*Id.*)

3.      Defendants in this action are Alan B. Levan, Jarett S. Levan, Jay C. McClung, Marcia K. Snyder, Valerie Toalson, James A. White, John E. Abdo, D. Keith Cobb, Steven M. Coldren, and David A. Lieberman.  (*Id.*)

4.      The Nominal Defendant in this action is Bancorp.  (*Id.*)

5.      There are nearly fifty million outstanding shares of Bancorp stock held by thousands of stockholders.  (*See* Bancorp's 2006, 2007, 2008, 2009, 2010 Forms 10-K.)[4]

6.      Defendants have denied all of Plaintiff's substantive allegations.  (D.E. 46.)

7.      Plaintiff's allegations in this action were based on an investigation of the information publicly available at the time suit was filed.  (*See* D.E. 1.)

8.      In this action, Plaintiff deposed: (a) Bancorp's President, Jarett Levan; (b) Bancorp's Chief Financial Officer, Valerie Toalson; (c) Bancorp's former Chief Financial Officer, James White; and (d) BankAtlantic's former Vice President of Commercial Real Estate for the relevant time period, Marcia Snyder.  (D.E. 71-2, 71-3, 71-4, 71-5, 71-6, 71-7.)

9.      In this action, Defendants deposed Plaintiff D.W. Hugo.  (D.E. 71-8.)

10.     James White and Jarett Levan provided deposition testimony that BankAtlantic complied with its own lending policies, which were considered more conservative than the rest of the market.  (D.E. 71-2, 71-5.)

11.     Valerie Toalson provided deposition testimony that relevant accounting rules did not allow a company to manage its earnings by taking loan loss reserves prior to the time the loans actually became troubled loans, confirmed the accuracy of Bancorp's publicly disclosed financial information, and confirmed the accuracy of the reporting with respect to the commercial real estate loan portfolio and loan loss reserves in particular.  (D.E. 71-3, 71-4.)

---

[4]  The Court takes judicial notice of the contents of these relevant SEC filings.  Fed. R. Evid. 201(b).

12.     Marcia Snyder provided deposition testimony that, notwithstanding the fact that the Steeplechase loan was handled in an appropriate manner, BankAtlantic was defrauded; BankAtlantic correctly relied on the accuracy of the outside appraisal it received on the property and on representations made by the borrower and his counsel that were investigated and appeared reliable; and the Steeplechase loan became a non-performing loan through no fault of BankAtlantic, but because of the deterioration of the market in general.  (D.E. 71-7, at 82:13–94:13.)

13.     Jarrett Levan, Valerie Toalson, and Marcia Snyder provided deposition testimony that, to the extent BankAtlantic's Commercial Real Estate loan portfolio suffered losses, those losses were the direct result of the credit and real estate market crises in Florida, and that Bancorp made express disclosures regarding precisely that issue.  (D.E. 71-2, 71-3, 71-4, 71-6, 71-7.)

14.     On July 1, 2009, the Parties participated in a lengthy mediation with Mark A. Buckstein as mediator, resulting in the Settlement.  (D.E. 55.)

15.     The Settlement herein provides, *inter alia*, for the mutual release of claims between and among Plaintiff, Defendants, and Nominal Defendant, without costs to any party.  (D.E. 71-1.)

16.     On September 30, 2009, the Court entered its Preliminary Approval Order, granting preliminary approval of the Settlement, and approving the form, content, and method of publication of the Notice to Bancorp's shareholders.  (D.E. 80.)

17.     Pursuant to the terms of the Preliminary Approval Order, the Notice was published on the Business Wire and in the Wall Street Journal, posted on BankAtlantic's website, and filed on a Form 8-K with the SEC.  (D.E. 82.)

18.     A single objector, Albert R. Feldman, a purported shareholder of Bancorp stock and plaintiff in the State Action, filed the sole objection to the Settlement.  (D.E. 83.)

19.     Plaintiff D.W. Hugo, Plaintiff's counsel, Defendants, and Defendants' counsel support the Settlement as fair, reasonable, and adequate.  (D.E. 127.)

20.     Defendants produced to Plaintiff almost 2,000,000 pages of documents and 28 deposition transcripts from the *Hubbard* action.  (D.E. 101.)

21.     Plaintiff's counsel undertook a complete and diligent review of the almost 2,000,000 pages of documents and 28 deposition transcripts from the *Hubbard* action.  (*See* D.E. 101.)

22.     Prior to trial in the *Hubbard* action, the Class Representatives in that case abandoned their accounting fraud and loan loss reserve claims, which are set forth throughout the Complaint in this action.  The Court entered summary judgment in favor of the *Hubbard* defendants on those claims.  (*See* Case No. 07-61542-CIV-UNGARO, hereinafter "*Hubbard*," D.E. 411.)

23.     On November 18, 2010, the jury returned its verdict in the *Hubbard* action, which was mainly in Defendants' favor, finding no liability as to Defendants Jarrett Levan, Abdo, and White, finding liability as to Defendants Alan Levan and

Bancorp on a limited number of statements, as to Toalson on a single statement, and awarded damages arising from those statements.  (*Hubbard*, D.E. 665.)

24.     In the *Hubbard* action, on April 25, 2011, the Court granted Defendants' Motion for Judgment as a Matter of Law as to all Defendants and all claims, finding, *inter alia*, that the evidence at trial did not support the jury's verdict.  (*Hubbard*, D.E. 695.)

### III.  CONCLUSIONS OF LAW

There is a strong policy favoring compromises that resolve litigation. *Williams v. First Nat'l Bank*, 216 U.S. 582 (1910); *see also In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) ("There is an overriding public interest in settling and quieting litigation.") (citations omitted). This is especially true with respect to "class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."  *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995). For derivative actions, which are "notoriously difficult and unpredictable," settlements are particularly favored.  *In re AOL Time Warner, Inc. Shareholder Deriv. Litig.*, 2006 WL 2572114, at *3 (S.D.N.Y. Sep. 6, 2008) (citations omitted); *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986) (stating that settlements of derivative actions are "favored for the reasons that settlements generally are favored: disputes are resolved; the resources of litigants and courts are saved; and, in the case of a derivative action, management can return its attention and energy from the courtroom to the corporation itself").

The settlement of a derivative action requires court approval.  Fed. R. Civ. P. 23.1.  In this regard, the Court is to determine whether a settlement is fair, reasonable, and adequate. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 537 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990).[5]  A proposed settlement enjoys a strong presumption that it is fair, reasonable, and adequate if it is the product of extensive, arm's-length negotiations conducted by capable counsel who are well-experienced in class and derivative actions.  *See In re EVCI Career Colleges Holding Corp Sec. Litig.*, 2007 WL 2230177, at *4 (S.D.N.Y. Jul. 27, 2007); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981).

Moreover, "where the settlement previously has been preliminarily approved, the settlement is presumptively reasonable and an objector must overcome a heavy burden to demonstrate its unreasonableness." *In re Terazosin Hydrochloride Antitrust Litig.*, 2005 WL 2451960, at *5 (S.D. Fla. Jul. 8, 2005) (citations omitted); *Ass'n for Disabled Americans*, 211 F.R.D. at 471 (same).  In analyzing any settlement that requires court approval, the Court must take into account "the

---

[5] The analysis and standards for approval of non-derivative class action settlements are relevant by analogy to the settlement of derivative claims.  *See In re United Health Group Inc. Shareholder Derivative Litig.*, 2009 WL 1929308, at *2 (D. Minn. July 6, 2009) (citations omitted); 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1839.

strong judicial policy favoring settlement as well as . . . the realization that compromise is the essence of settlement." *Bennett*, 737 F.2d at 986.

In determining whether a settlement is fair, reasonable, and adequate the Court considers (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement would be deemed fair, adequate and reasonable; (4) the complexity, expense, and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Bennett*, 737 F.2d at 986; *Sterling v. Stewart*, 158 F.3d 1199, 1204 (11th Cir. 1998).

These factors need not be applied formalistically; rather, the fairness of a settlement is left to the sound discretion of the court and will not be overturned absent a clear showing of abuse of that discretion. *See Sterling*, 158 F.3d at 1204. Therefore, in exercising its discretion:

> the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).  In evaluating these considerations, the Court must not try the case on the merits. *Ass'n for Disabled Americans*, 211 F.R.D. at 467 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).  Rather, the Court "must rely upon the judgment of

experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'" *Ass'n for Disabled Americans*, 211 F.R.D. at 467.

Based on the foregoing principles, and as set forth below, the Court concludes the Settlement reached by the Parties is fair, reasonable, and adequate and in the best interests of Bancorp and its shareholders.

### A.      There Is No Evidence of Collusion Among the Parties

This action has been pending since July 2, 2008, and had been pending for over a year at the time the Parties entered the Stipulation of Settlement.  During that time, Plaintiff conducted pre- and post-filing investigations of the derivative claims and the events and transactions underlying those claims, including, but not limited to, inspection, review, and analysis of Bancorp's relevant public filings.  The Parties filed extensive legal memoranda with respect to Defendants' Motion to Dismiss the Complaint.  After Defendants filed an Answer, Plaintiff deposed Bancorp's President, its current and former Chief Financial Officers, and BankAtlantic's former Vice President of Commercial Real Estate for the relevant time period.  Defendants deposed the Plaintiff, D.W. Hugo.  Since the close of discovery, the Parties had been preparing motions for summary judgment and for trial.  In addition, Defendants produced to Plaintiff, and Plaintiff undertook a complete and diligent review of, almost 2,000,000 pages of documents and 28 deposition transcripts from the *Hubbard* action.

The Parties have represented that the settlement was the culmination of good faith, arm's-length bargaining among sophisticated practitioners, and there is

no evidence to the contrary.  Moreover, the settlement was achieved in the presence and with the assistance of an experienced mediator.

Based on the foregoing, the Court concludes the Settlement was the result of good faith, arm's-length bargaining among sophisticated practitioners, with the assistance of an experienced mediator.  That the Settlement does not provide for any sort of monetary consideration or for the payment of attorneys' fees further supports the appropriate nature of the relationship.  *See In re Zoran Corp. Derivative Litig.*, 2008 WL 941897, at *2 (N.D. Cal. Apr. 7, 2008) (noting that collusive settlements typically entail handsome attorneys' fees to plaintiff's counsel as *quid pro quo* for broad releases and disposal of troublesome claims).  The Court concludes these factors support final approval of the Settlement.

## B.   There Are Significant Risks With Continued Litigation, Reducing the Likelihood of Success at Trial

Derivative actions are notoriously complex and expensive to prosecute.  *See, e.g., In re AOL Time Warner*, 2006 WL 2572114, at *3 (approving a derivative settlement and noting that "shareholder derivative actions are notoriously difficult and unpredictable") (citations omitted); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (affirming the approval of a derivative action settlement and noting that the "odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful").

Had Plaintiff continued to litigate this case, he would have faced numerous potential risks and costs, including the potential for successful attacks against the pleadings, the high costs associated with lengthy and complex litigation, potential

loss at the summary judgment stage, and the inherent risks of trial should the case progress that far.  Even a favorable judgment at trial would have undoubtedly resulted in numerous post-trial motions. And, even if liability were established, the amount of recoverable damages would have been uncertain.  There is a genuine risk that, after years of litigation, Plaintiff would have recovered nothing.

The risk of no recovery faced by Plaintiff at the time the Settlement was executed has increased, as evidenced by the *Hubbard* jury verdict and subsequent grant of Defendants' Motion for Judgment as a Matter of Law.  The *Hubbard* verdict absolved three of the primary Defendants in this action from liability for securities fraud, and the granting of Defendants' Motion for Judgment as a Matter of Law absolved two more.  Additionally, among the documents produced to Plaintiff from the *Hubbard* action were Office of Thrift Supervision Reports of Examination received on June 23, 2006 and November 9, 2007.  The 2006 report indicated BankAtlantic's loan underwriting and concentration was appropriate.  The 2007 report indicated BankAtlantic's loan losses were caused by the economy generally.  These reports, which were provided directly to Bancorp and BankAtlantic executives by the Office of Thrift Supervision, but were not available to the public, increase the difficulty in establishing breaches by BankAtlantic's executives.

Coupled with the foregoing risks, in order to prevail Plaintiff also would have had to overcome the protections afforded Defendants under the "business judgment rule."  Although referred to as a "rule," the idea of "business judgment protection"

for directors is more akin to a broad doctrine or concept, and it is perhaps, the fundamental precept of corporate law. *See generally In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). While the business judgment rule has been articulated in slightly varied ways, it stands for the proposition that there is strong presumption that, in making a disinterested business decision, the directors of a corporation acted on an informed basis, in good faith, and with the honest belief the action taken was in the best interests of the corporation. *Disney*, 907 A.2d at 746-47. The prospect that Defendants could have been shielded by this protection makes establishing liability less likely.

Similarly, by reaching a settlement, Defendants avoid the significant risks and costs of litigation, including the costs associated with continued litigation, potential liability, and damages exposure. More importantly, the settlement allows Defendants to end the distraction that arises from the litigation and the corresponding drain on resources, and instead focus on running their business.

Based on the foregoing, the Court concludes the risks associated with continuing the litigation are significant. The Settlement eliminates these and other risks of continued litigation. The Court concludes these factors support final approval of the Settlement.

### C.    This Action is Complex and Continuation of Litigation Would be Expensive and Lengthy

Related to the foregoing discussion, the continuation of this litigation would require the resolution of numerous complex issues of law at the cost of considerable time and expense to the Parties and the Court. As previously discussed, derivative

actions are notoriously complex, often including resolution of the issues related to the business judgment rule. This action is no different. Moreover, continuation of the litigation would be expensive and lengthy. Given the number of individual Defendants, the summary judgment motions alone would impose serious expense and burden on the Parties and the Court. And those burdens would only increase with a trial. *See AOL Time Warner*, 2006 WL 2572114, at *5 ("this litigation boasts numerous defendants, multiple claims, and complex factual issues; the prosecution of this action would require the Company to incur substantial costs.").

Based on the foregoing, the Court concludes this action is complex and the continued litigation of this action in the absence of final approval of the Settlement would result in the expenditure of considerable time and resources to the Parties and the Court. The Court concludes these factors support final approval of the Settlement.

### D.     The Settlement Terms are Appropriate

"[T]he determination of a reasonable settlement is not susceptible of a mathematical equation yielding a particularized sum." *Arambaru v. Healthcare Fin. Servs., Inc.*, 2009 WL 1086938, at *4 (E.D.N.Y. Apr. 22, 2009) (citation omitted). There is, rather, "a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate . . . there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a

thousandth part of a single percent of the potential recovery." *Arambaru*, 2009 WL 1086938, at *4 (citations omitted); *see also Officers for Justice*, 688 F.2d at 624 ("the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.") (citations and internal quotations omitted).  Non-monetary settlement benefits may support approval of a settlement.  *See Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) ("non-pecuniary benefits to the corporation may support a settlement").

"In evaluating the fairness, reasonableness and adequacy of a settlement, the court is primarily concerned with the strength of the case for plaintiffs on the merits balanced against the amount offered in settlement." *In re AOL Time Warner*, 2006 WL 2572114, at *3 (citation omitted).

The Settlement provides for an exchange of mutual releases and a dismissal with prejudice of all claims against all Defendants.  There is no additional consideration, monetary or otherwise, for the Settlement.  As explained below, for this particular case, this Settlement is eminently reasonable and appropriate.

The Settlement in the instant case confers significant benefits on Plaintiff and Defendants, as well upon Bancorp and its shareholders.  As discussed above, the Settlement eliminates the numerous risks, costs, and burdens of litigation for Plaintiffs, Defendants, and the Nominal Defendant.  Defendants receive the significant benefits that flow from resolving the claim and thus eliminating the possibility of an adverse judgment.  Defendants also will save costs and time by ending the litigation now and will gain the security of a release for any and all

claims that could have been brought in this case.

The benefit to Plaintiff is equally tangible.  Plaintiff enjoys the same cost- and time-saving benefits as Defendants, as the Settlement will obviate the need for further litigation expense.  Plaintiff also receives a release for any claims that could have brought with respect to the prosecution of the derivative claim, including a potential statutory claim for attorneys' fees and costs incurred by Defendants in defending against the claim, should Plaintiff's case have proved unsuccessful.

Significantly, Plaintiff, in his derivative capacity representing the interests of Nominal Defendant Bancorp and its other shareholders, secures the benefit of freeing company resources that otherwise would have been spent on this case.  In that regard, Bancorp will now be able to focus its efforts on managing its substantive business in a challenging economic environment.

The benefits flowing from the Settlement are of particular value when compared to the strength of the claims in this case.  As previously discussed, the risks associated with continuing this litigation are significant, while the likelihood of success is minimal.  Viewed in this light, the Settlement terms are appropriate and reasonable.

*In re Fleet/Norstar Securities Litig.*, 935 F. Supp. 99 (D.R.I. 1996), which involved the dual analysis of separate settlements of a securities class action and a shareholder derivative action, is particularly instructive.  The nature of the claims are quite similar:

> The plaintiffs' claims were based on Defendants' alleged gross mismanagement of Fleet's loan portfolios....  The origin of both actions is

> the serious deterioration of real estate values in the New England area
> that occurred in the second half of 1989 and continued into 1990. One of
> the consequences was an increase in the number and amount of
> delinquent bank loans to developers and purchasers of real estate.

935 F. Supp. at 103. The substance of the plaintiffs' core assertion is similarly

comparable:

> Fleet's management misrepresented to the investing public that the
> Company was a highly successful banking operation which had deftly
> managed to avoid the abyss of the deteriorating New England real estate
> market into which other banks had fallen.

*Id.* The court concluded:

> The Court is well aware that this litigation was protracted and complex.
> Yet, it is worth remembering that the true genesis of this litigation was
> an unfortunate downturn of the real estate economy in New England.
> Perhaps the injuries alleged by the stockholders in this case are
> attributable only to the economic downturn.

*Id.* at 117.

Against this backdrop, the parties in *Fleet/Norstar* entered into a "clear

sailing agreement." *Id.* at 104. This "clear sailing agreement" provided for an

award of attorneys' fees and reimbursement of expenses not to exceed $499,000,

which the defendant agreed to pay, in exchange for the plaintiffs' agreement to end

the case. *Id.* In evaluating and approving the settlement, the court determined the

"settlement is voluntary," with "no evidence of coercion or outright collusion." *Id.* at

111. The court then determined that such a clear sailing agreement, even with a

payment of attorneys' fees to plaintiffs' counsel, "does not offend state or federal

statutes, nor the Constitution." *Id.*

The court in *Fleet/Norstar*, approved the settlement but refused to award attorneys' fees, noting that "the most important factor is the strength of the case for the plaintiffs on the merits, balanced against the amount offered in settlement." *Id.* at 111 (citations omitted).  In that regard, the court noted "[t]he merits of the derivative action were tenuous at best." *Id.*  The court further observed:

> While a brief evaluation of the claims leads the Court to seriously doubt the value of the plaintiffs' derivative action, approval of the settlement is warranted. The proposed settlement offered by Fleet obviously does not provide for a payment of damages to itself.  It includes only the option of payment of Plaintiff's attorneys' fees. This is the only possible financial recovery available to Plaintiff.  For reasons discussed below, the Court declines to award attorney fees to derivative Plaintiff counsel. Therefore, Fleet is not required to pay anything to Plaintiffs.  A settlement which includes only the possibility of the payment of attorney fees is fair, adequate and reasonable in light of the weak claims presented by Plaintiff.

*Id.* at 112.  Thereafter, the court noted the business judgment rule would likely bar recovery in any event.  *Id.* at 114–15.

In light of the factual record in this case, Plaintiff's claims might prove unsuccessful at summary judgment or trial.  Even if Plaintiff were successful in establishing liability, establishing damages at trial would have required Plaintiff to prove, *inter alia*, that Defendants' breaches actually caused Bancorp to suffer damages and the individual Defendants, as a matter of law, may be held liable for those damages.  The damages issue undoubtedly would have been hotly disputed and uncertain.  It is conceivable that the finder of fact would find that there were no damages in this case, providing Plaintiff with no recovery. [6]

---

[6] Even a victory at trial is no guarantee that a judgment would ultimately be sustained on appeal.  Substantial judgments awarded by trial courts have been reversed on appeal.  *See,*

Based on the foregoing, the Court concludes that the terms of the Settlement are appropriate, are well within the range of possible recovery, and support final approval of the Settlement.

**E.      The Litigation Is at An Advanced Stage**

This action has been pending since July 2, 2008, and had been pending for over a year at the time the Parties entered the Stipulation of Settlement.  Plaintiff deposed Bancorp's President, Chief Financial Officer, former Chief Financial Officer, and BankAtlantic's former Vice President of Commercial Real Estate for the relevant time period.  In addition to reviewing publicly available information, including Defendants' public filings, Plaintiff undertook a complete and diligent review of almost 2,000,000 pages of documents and 28 deposition transcripts produced by Defendants from the *Hubbard* action.  In addition, vigorous and contentious motion practice has been present from the beginning of this action, including a motion to dismiss and numerous discovery-related motions.

The Settlement resulted from extensive arm's length negotiations, some of which were overseen and assisted by mediator Mark Buckstein.  Even after reaching an agreement in principle, the Parties continued meaningful discussions to reduce the Settlement to writing.  The negotiations commenced near the time when the Parties were preparing motions for summary judgment and for trial.

---

*e.g., In re Apple Computer Sec. Litig.*, 1991 WL 238298 (N.D. Cal. Sep. 6, 1991) ($100 million jury verdict in favor of plaintiff overturned and judgment entered in favor of defendant); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial).  Add to these appellate risks the difficulty and unpredictability of a lengthy and complex trial—where witnesses could suddenly become unavailable or the fact finder could react to the evidence in unforeseen ways—and the benefits of the settlement are more apparent.

Consequently, "the parties and the Court are well placed to assess the strength of this case and the comparative benefits of the proposed settlement." *Fresco v. Auto Data, Inc.*, 2007 WL 2330895, at *6 (S.D. Fla. May 14, 2007).

Based on the foregoing, the Court concludes this litigation was at an advanced stage at the time the Parties entered the Stipulation of Settlement, which supports final approval of the Settlement.

**F.    The Parties' Experienced Counsel Support Final Approval of the Settlement**

The view of the attorneys actively conducting the litigation regarding the appropriateness of a proposed settlement is "entitled to significant weight." *Fisher Bros. v. Cambridge-Lee Indus., Inc.*, 630 F. Supp. 482, 488 (E.D. Pa. 1985); *see also Fresco*, 2007 WL 2330895, at *6 ("The unanimous support of counsel for this settlement weighs strongly in favor of its approval."); *In re NVIDIA Corp.*, 2008 WL 5382544, at *4 ("significant weight should be attributed to counsel's belief that settlement is in the best interests of those affected by the settlement").

Counsel for the Parties are experienced practitioners in this specialized area of the law, with many years of experience representing plaintiffs and defendants in complex securities, shareholder, and corporate litigation.  These attorneys have considered the relative strengths and weaknesses of their respective cases and have reached the agreement embodied in the Stipulation of Settlement and all recommend its approval.

The Court concludes experienced counsel for the Parties in this litigation have endorsed the Settlement after weighing all relevant facts and concludes the

endorsement of Counsel for the Parties supports final approval of the Settlement.

### G.   The Reaction of Bancorp's Shareholders Supports Final Approval of the Settlement

A lack of objections "militates strongly in favor of the Court finding that the proposed settlement should be approved." *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1332 (S.D. Fla. 2001).  "[T]he reaction of the class to the proffered settlement is perhaps the most significant factor to be weighed in considering its adequacy." *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990).  A small number of objections are convincing evidence of the fairness and adequacy of a proposed settlement.  *See, e.g., Rome v. Archer*, 197 A.2d 49, 58 (Del. 1964) (approving settlement agreement which was ratified by a very large majority of the stockholders).

Pursuant to the terms of the Preliminary Approval Order, a Court-approved Notice was published on the Business Wire and in the Wall Street Journal, posted on BankAtlantic's website, and filed on a Form 8-K with the SEC.  Despite there being nearly fifty million outstanding shares of Bancorp stock held by thousands of shareholders, there was only one objector, Mr. Feldman, to the Settlement.

The Court concludes the presence of a single objector constitutes convincing evidence of the Settlement's fairness and adequacy.  The Court concludes this factor supports final approval of the Settlement.  The Court's conclusion is bolstered by the lack of merit of Mr. Feldman's objections, as well as the circumstances relevant to Mr. Feldman's objections.  The Court previously overruled Mr. Feldman's objections, as well as similar complaints set forth in various pleadings filed by Mr.

Feldman.  (D.E. 73, 89.)

Subsequent events further support the Court's overruling Mr. Feldman's objections.  Through his various pleadings, Mr. Feldman argued Bancorp's interests had not been adequately represented because Plaintiff had taken only deposition testimony before settling the case, had not obtained document discovery, and contended the appropriate remedy was to stay this case and allow him to prosecute the State Action.  (*See* D.E. 59, 72, 83.)  To the extent Mr. Feldman's objections had merit, Plaintiff's receipt and review of the entirety of discovery in the *Hubbard* action eliminated those concerns.  Moreover, Mr. Feldman has not taken any further steps to pursue the State Action, despite a professed intention to do so.

### H.    No Additional Notice is Required

On September 30, 2009, through the Preliminary Approval Order, the Court approved the form and content of the Notice to Bancorp shareholders and the manner in which the Notice would be published.  (DE 80.)  Shortly thereafter, the Notice was published on the Business Wire and in the Wall Street Journal, posted on BankAtlantic's website, and filed on a Form 8-K with the SEC.

As the record in this action evidences, more than one and one-half years have passed since the Notice was published.  This passage of time raised, in the Court's opinion, the question of whether additional notice to Bancorp shareholders was necessary or required.  The Court concludes additional notice to Bancorp shareholders is neither necessary nor required.

Rule 23.1 of the Federal Rules of Civil Procedure provides that a "[n]otice of a

proposed settlement … must be given to shareholders or members in the manner that the court directs." Thus, the determination of whether additional notice is required is within the discretion of the Court. Although neither Rule 23 nor Rule 23.1 speak to the requirement of additional notice, other courts have found that additional notice is required only when the interests of the class have been materially or substantially impaired since the original notice was disseminated. *See, e.g., In re Packaged Ice Antitrust Litig.*, 2011 WL 717519, at *2–3 (E.D. Mich. Feb. 22, 2011) (additional notice informing class members of the plan of allocation and providing a claim form was required when not contained in the original notice); *Weber v. Gov't Emp'rs Ins. Co.*, 2009 WL 2496811, at *2-5 (D.N.J. Aug. 11, 2009) (requiring additional notice when the original notice campaign was found ineffective and the rights of the class would be substantially impaired unless additional notice was provided).

Conversely, when the interests of the class are minimally impacted, or not impacted at all, by events subsequent to the dissemination of the original notice, additional notice is neither necessary nor required. *See, e.g., Seamands v. Sears Holding Corp.*, 2010 U.S. Dist. LEXIS 62770, *8–9 (D. Kan. June 24, 2010) (allowing modification of proposed class settlement agreement prior to final judgment "without giving any additional notice to the Class…, provided that such modifications in the aggregate are not materially adverse to the Class."); *Harris v. Graddick*, 615 F. Supp. 239, 244 (M.D. Ala. 1985) (amendment to consent decree did not require additional notice when the amendment was narrow and it was "clearly

apparent that the interests of the class [we]re not substantially impaired....").

The Court concludes that the Parties disseminated the Notice in the manner and form approved by the Court to all Bancorp shareholders and that the Notice complied with the requirements of Rule 23.1 of the Federal Rules of Civil Procedure and satisfied the requirements of due process. The Court further concludes that all shareholders were provided the opportunity to object to or comment on the Settlement. There have been no modifications or changes to the terms of the Settlement since that Notice was disseminated. And subsequent events have not strengthened the shareholders' claims or otherwise rendered the Settlement a less desirable outcome for Bancorp shareholders. Based on the foregoing, the Court concludes additional notice to BankAtlantic shareholders is neither necessary nor required.

## IV. Conclusion and Dismissal

Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure and on the basis of the foregoing findings of fact and conclusions of law, it is hereby

ORDERED AND ADJUDGED as follows:

1.      The Joint Motion for Final Approval of Settlement (D.E. 127) is GRANTED.

2.      The Settlement embodied in the Stipulation of Settlement is hereby APPROVED as fair, reasonable, and adequate.

3.      Plaintiff, on behalf of himself and Bancorp, and each of their predecessors, successors, parents, subsidiaries, affiliates, custodians, agents, assignees, representatives, heirs, executors, trustees, administrators,

attorneys, associates, partners, past, present and future employees, officers, and directors and any other person or entity having any legal or beneficial interest in the common stock of Bancorp shall be deemed conclusively to have released and settled each and every of the Settled Claims[7] against each of the Released Parties.[8]

Notwithstanding that Plaintiff or Bancorp may hereafter discover facts in addition to, or different from, those which Plaintiff or Bancorp now know, or believe, to be true with respect to the Action and the Settled Claims, Plaintiff, on behalf of himself and Bancorp, and each of their predecessors, successors, parents, subsidiaries, affiliates, custodians, agents, assignees, representatives, heirs, executors, trustees, administrators, attorneys,

---

[6] "Settled Claims" is defined in the Stipulation as "all claims, debts, demands, rights or causes of action or liabilities whatsoever by Plaintiff, on behalf of himself and BankAtlantic Bancorp, against the Released Parties (including, but not limited to, any claims for damages, interest, attorneys' fees, expert or consulting fees, and any other costs, expenses or liability whatsoever, or injunctive, equitable or other relief), whether based on federal, state, local, statutory or common law or any other law, rule or regulation, whether fixed or contingent, accrued or unaccrued, liquidated or unliquidated, at law or in equity, matured or un-matured, whether class or individual in nature, including both known claims and unknown claims, including without limitation, claims for negligence, gross negligence, breach of duty of care, breach of duty of loyalty, breach of duty of candor, fraud, negligent misrepresentation, breach of fiduciary duty or violations of any state or federal statutes, rules, regulations or common law which arise out of, relate in any way to, or in connection with the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in this Action by Plaintiff or BankAtlantic Bancorp against any of the Released Parties, or that have been or could have been asserted in any forum by Plaintiff or BankAtlantic Bancorp against any of the Released Parties, provided, however that 'Settled Claims' do not include claims under the federal securities laws or ERISA that have been, or could have been, asserted in the Securities Action or the ERISA action."

[7] "Released Parties" is defined in the Stipulation as "Defendants, Nominal Defendant, and the past, present or future officers, directors, employees, partners, agents, attorneys, underwriters, investment bankers, advisors, insurers, associates, legal representatives, heirs, predecessors, executors, successors, administrators, assigns or immediate families of any Released Party or its or his subsidiaries and affiliates."

associates, partners, past and present employees, officers and directors, and

any other person or entity having a legal or beneficial interest in the common

stock of Bancorp, shall be deemed conclusively, upon the Effective Date, to

have fully, finally, unconditionally and forever released, settled and

discharged Nominal Defendant, Defendants and the other Released Parties

from, and with respect to, all Settled Claims, including, without limitation,

all claims known or unknown, suspected or unsuspected, contingent or non-

contingent, which now exist, may hereafter exist, or heretofore existed, and

without regard to the subsequent discovery or existence of different or

additional facts and are fully, finally conclusively and forever deemed to have

waived any and all rights they may have under any statute, including but not

limited to § 1542 of the California Civil Code, or common law principle which

would limit the effect of the foregoing release to those Settled Claims actually

known or suspected to exist at the time of the effectiveness of the foregoing

release.

4.      Nominal Defendant and Defendants shall be deemed conclusively to

have released and settled any and all claims that have been or could have

been asserted against Plaintiff and/or Plaintiff's Counsel relating to the

institution, prosecution or settlement of the Action or the Settled Claims.

5.      Plaintiff, on behalf of himself and Bancorp, and each of their

predecessors, successors, parents, subsidiaries, affiliates, custodians, agents,

assignees, representatives, heirs, executors, trustees, administrators,

attorneys, associates, partners, past and present employees, officers and

29

directors, and any other person or entity having a legal or beneficial interest in the common stock of Bancorp, are hereby barred and permanently enjoined from prosecuting the Settled Claims against Nominal Defendant, Defendants or Released Parties.

6.      If the Settlement is disapproved or terminated, the Stipulation shall have no force or effect, and all negotiations and statements made in connection therewith and in connection with the Stipulation shall be without prejudice to the right of any persons.  The parties to the Action shall be restored to their respective positions existing prior to executing the Stipulation.

7.      Neither the Stipulation nor any orders or judgments entered in connection with the Stipulation or the Settlement, the negotiations leading up to or in connection with the Stipulation or the Settlement nor any action taken pursuant to or to carry out the Stipulation or the Settlement is, may be construed as, or may be used as evidence or an admission by or against Nominal Defendant, Defendants or Released Parties of any fact, claim, assertion, matter, contention, fault, culpability, obligation, wrongdoing or liability whatsoever.  The Stipulation and its exhibits and any order entered in connection therewith may be filed in this action or related litigation as evidence of the Settlement, or to enforce its terms or in any subsequent action against or by Nominal Defendant, Defendants or Released Parties to support a defense of *res judicata*, collateral estoppel, release or other theory

of claim or issue preclusion or similar defense.

8.      If the Settlement does not become Final in accordance with the terms

of the Stipulation, then the Final Judgment shall be rendered null and void

and shall be vacated and, in such event, all orders entered in connection

therewith shall be vacated and rendered null and void.

9.      Without affecting the finality of this Order in any way, this Court shall

retain continuing jurisdiction over implementation of this Settlement and

this Action until this Order becomes final and each and every act agreed to be

performed by the parties has been performed pursuant to the Stipulation and

all parties to this Action for the purpose of enforcing and administering the

Stipulation.

10.     This Action is DISMISSED in its entirety WITH PREJUDICE as

against Nominal Defendant and Defendants, and without costs to any party.

DONE AND ORDERED in Chambers at Miami, Florida, this 11th day of

July, 2011.


_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE


copies provided:
Counsel of record

31